LEO SHEEP CO. ET AL. v. UNITED STATES ET AL.

No. 77–1686.   Argued January 15, 16, 1979—Decided March 27, 1979

REHNQUIST, J., delivered the opinion of the Court, in which all other Members joined except WHITE, J., who took no part in the consideration or decision of the case.

*Clyde O. Martz* argued the cause for petitioners. With him on the briefs were *Howard L. Boigon, John A. MacPherson,* and *T. Michael Golden.*

*Sara Sun Beale* argued the cause for respondents. With her on the brief were *Peter R. Steenland, Jr., Raymond N. Zagone,* and *Edward J. Shawaker.**

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

This is one of those rare cases evoking episodes in this country's history that, if not forgotten, are remembered as dry facts and not as adventure. Admittedly the issue is mundane: Whether the Government has an implied easement to build a road across land that was originally granted to the Union Pacific Railroad under the Union Pacific Act of 1862—a grant that was part of a governmental scheme to subsidize the construction of the transcontinental railroad. But that issue is posed against the backdrop of a fascinating chapter in our history. As this Court noted in another case involving the Union Pacific Railroad, "courts, in construing a statute, may with propriety recur to the history of the times when it was passed; and this is frequently necessary, in order to ascertain the reason as well as the meaning of particular provisions in it." *United States* v. *Union Pacific R. Co.,* 91 U. S. 72, 79 (1875). In this spirit we relate the events underlying passage of the Union Pacific Act of 1862.

---

*\*Russell H. Carpenter, Jr., Stuart C. Stock, C. George Niebank,* and *Alan C. Furth* filed a brief for Union Pacific Land Resources Corp. et al. as *amici curiae* urging reversal.

*Henry A. Burgess, William C. Farmer,* and *David M. Bridges* filed a brief for Energy Transportation Systems, Inc., as *amicus curiae* urging affirmance.

## I

The early 19th century—from the Louisiana Purchase in 1803 to the Gadsden Purchase in 1853—saw the acquisition of the territory we now regard as the American West.[1] During those years, however, the area remained a largely untapped resource for the settlers on the eastern seaboard of the United States did not keep pace with the rapidly expanding western frontier. A vaguely delineated area forbiddingly referred to as the "Great American Desert" can be found on more than one map published before 1850, embracing much of the United States' territory west of the Missouri River. As late as 1860, for example, the entire population of the State of Nebraska was less than 30,000 persons, which represented one person for every five square miles of land area within the State.

With the discovery of gold at Sutter's Mill in California in 1848, the California gold rush began and with it a sharp increase in settlement of the West. Those in the East with visions of instant wealth, however, confronted the unenviable choice among an arduous 4-month overland trek, risking yellow fever on a 35-day voyage via the Isthmus of Panama, and a better than 4-month voyage around Cape Horn. They obviously yearned for another alternative, and interest focused on the transcontinental railroad.

The idea of a transcontinental railroad predated the California gold rush. From the time that Asa Whitney had proposed a relatively practical plan for its construction in 1844, it had, in the words of one of this century's leading historians of the era, "engaged the eager attention of promoters and politicians

---

[1] Except as otherwise noted, this historical discussion draws on C. Ames, Pioneering the Union Pacific (1969); R. Athearn, Union Pacific Country (1971); R. Howard, The Great Iron Trail (1962); J. McMaster, A History of the People of the United States During Lincoln's Administration (1927); 2 A. Nevins, Ordeal of the Union (1947); H. White, History of the Union Pacific Railway (1895).

until dozens of schemes were in the air." [2] The building of the railroad was not to be the unalloyed product of the free-enterprise system. There was indeed the inspiration of men like Thomas Durant and Leland Stanford and the perspiration of a generation of immigrants, but animating it all was the desire of the Federal Government that the West be settled. This desire was intensified by the need to provide a logistical link with California in the heat of the Civil War. That the venture was much too risky and much too expensive for private capital alone was evident in the years of fruitless exhortation; private investors would not move without tangible governmental inducement. [3]

In the mid-19th century there was serious disagreement as

---

[2] 2 Nevins, *supra* n. 1, at 82.

[3] That exhortation came from some of the great visionaries of the 19th century. On the floor of the House, Thomas Hart Benton compared eastern Kansas to Egypt and extolled the wealth that would be shared by a private railroad to California. Athearn, *supra* n. 1, at 22–23. Senator William H. Seward of New York, a man not known for his timidity, proclaimed "that a railroad is necessary, and ought to be built; and I think it has been scientifically demonstrated . . . that not only one such road is feasible, but that at least three, four, or five routes offer the necessary facilities for the security of this great object." Cong. Globe, 35th Cong., 1st Sess., 1584 (1858). In his book An Overland Journey, Horace Greeley was equally enthusiastic. He went so far as to calculate the economic feasibility of the proposed railroad line by estimating potential revenue, based on the value of current shipments of gold from California, passenger fares that could be obtained, and the cost to the Government of transporting and maintaining an army in the West and providing mail services. H. Greeley, An Overland Journey 310–316 (C. Duncan ed. 1964).

But despite his enthusiasm Greeley appreciated that the effort was beyond private capital alone. "The amount is too vast; the enterprise too formidable; the returns too remote and uncertain." "[W]hat assurance could an association of private citizens have that, having devoted their means and energies to the construction of such a road, it would not be rivaled and destroyed by a similar work on some other route?" *Id.*, at 324.

to the forms that inducement could take. Mr. Justice Story, in his Commentaries on the Constitution, described one extant school of thought which argued that "internal improvements," such as railroads, were not within the enumerated constitutional powers of Congress.[4] Under such a theory, the direct subsidy of a transcontinental railroad was constitutionally suspect—an uneasiness aggravated by President Andrew Jackson's 1830 veto of a bill appropriating funds to construct a road from Maysville to Lexington within the State of Kentucky.[5]

The response to this constitutional "gray" area, and source of political controversy, was the "checkerboard" land-grant scheme. The Union Pacific Act of 1862 granted public land to the Union Pacific Railroad for each mile of track that it laid.[6] Land surrounding the railway right-of-way was divided into "checkerboard" blocks. Odd-numbered lots were granted to the Union Pacific; even-numbered lots were reserved by the Government. As a result, Union Pacific land in the area of the right-of-way was usually surrounded by public land, and vice versa. The historical explanation for this peculiar disposition is that it was apparently an attempt to disarm the "internal improvement" opponents by establishing a grant scheme with "demonstrable" benefits. As one historian notes in describing an 1827 federal land grant intended to facilitate private construction of a road between Columbus and Sandusky, Ohio:

"Though awkwardly stated, and not fully developed in the Act of 1827, this was the beginning of a practice to be followed in most future instances of granting land for the

---

[4] 2 J. Story, Commentaries on the Constitution 166–172 (5th ed. 1891). See Cong. Globe, 35th Cong., 2d Sess., 579–585 (1859) (Sen. Andrew Johnson).

[5] 2 J. Richardson, A Compilation of the Messages and Papers of the Presidents 1789–1897, pp. 483–493 (1896).

[6] Act of July 1, 1862, 12 Stat. 489.

construction of specific internal improvements: donating alternate sections or one half of the land within a strip along the line of the project and reserving the other half for sale. . . . In later donations the price of the reserved sections was doubled so that it could be argued, as the *Congressional Globe* shows *ad infinitum,* that by giving half the land away and thereby making possible construction of the road, canal, or railroad, the government would recover from the reserved sections as much as it would have received from the whole." P. Gates, History of Public Land Law Development 345–346 (1968).[7]

In 1850 this technique was first explicitly employed for the subsidization of a railroad when the Illinois delegation in Congress, which included Stephen A. Douglas, secured the enactment of a bill that granted public lands to aid the construction of the Illinois Central Railroad.[8] The Illinois Central and proposed connecting lines to the south were granted nearly three million acres along rights of way through Illinois, Mississippi, and Alabama, and by the end of 1854 the main line of the Illinois Central from Chicago to Cairo, Ill., had been put into operation. Before this line was constructed, public lands had gone begging at the Government's minimum price; within a few years after its completion, the railroad had disposed of more than one million acres and was rapidly

---

[7] Government grants to aid the development of transportation facilities gained momentum during the administration of John Quincy Adams, who did not share Madison's and Monroe's reservations about the constitutionality of the Government's involvement in such activities. Checkerboard land grants achieved currency during the canal era. Apparently the first such grant was to aid construction of the Wabash and Erie Canal in Indiana. See P. Gates, History of Public Land Law Development 341–356 (1968).

[8] Act of Sept. 20, 1850, 9 Stat. 466. This was not, however, the first time land grants were used to subsidize a railroad. In 1833, Congress permitted a grant that had been intended for canal construction to be used instead for the building of a railroad. Gates, *supra* n. 7, at 357.

selling more at prices far above those at which land had been originally offered by the Government.

The "internal improvements" theory was not the only obstacle to a transcontinental railroad. In 1853 Congress had appropriated moneys and authorized Secretary of War Jefferson Davis to undertake surveys of various proposed routes for a transcontinental railroad. Congress was badly split along sectional lines on the appropriate location of the route—so badly split that Stephen A. Douglas, now a Senator from Illinois, in 1854 suggested the construction of a northern, central, and southern route, each with connecting branches in the East.[9] That proposal, however, did not break the impasse.

The necessary impetus was provided by the Civil War. Senators and Representatives from those States which seceded from the Union were no longer present in Congress, and therefore the sectional overtones of the dispute as to routes largely disappeared. Although there were no major engagements during the Civil War in the area between the Missouri River and the west coast which would be covered by any transcontinental railroad, there were two minor engagements which doubtless made some impression upon Congress of the necessity for being able to transport readily men and materials into that area for military purposes.

Accounts of the major engagements of the Civil War do not generally include the Battle of Picacho Pass, because in the words of Edwin Corle, author of The Gila, "[i]t could be called nothing more than a minor skirmish today." [10] It was

---

[9] Asa Whitney's original proposal had contemplated an eastern terminus on the south shore of Lake Michigan, and a western terminus in northern California or Oregon. Senator Gwin of California, a Southern sympathizer, urged a route running from Memphis through Ft. Smith and Albuquerque to Los Angeles. Thomas Hart Benton of Missouri, eschewing both the extreme northern and extreme southern routes, advocated "a great central national highway"—beginning in St. Louis. 2 Nevins, *supra* n. 1, at 82–83.

[10] E. Corle, The Gila 232 (1951).

fought 42 miles northwest of Tucson, Ariz., on April 15, 1862, between a small contingent of Confederate cavalry commanded by Captain Sherod Hunter and Union troops under Colonel James H. Carleton consisting of infantry, cavalry, and artillery components known as the "California Volunteers." The battle was a draw, with the Union forces losing three men and the badly outnumbered Confederates apparently suffering two men killed and two captured. Following the battle, the Confederate forces abandoned Tucson, which they had previously occupied, and Carleton's Union forces entered that city on May 20, 1862.

The Battle of Glorieta Pass has similarly endured anonymity. Also described as La Glorieta Pass or Apache Canyon, Glorieta Pass lies in the upper valley of the Pecos River, in the southern foothills of the Sangre de Cristo range of the Rocky Mountains near Santa Fe, N. M. Here in the early spring of 1862 a regiment of Colorado volunteers, having moved by forced marches from Denver to Ft. Union, turned back Confederate forces led by Brigadier General Henry Sibley which, until this encounter, had marched triumphantly northward up the Rio Grande Valley from Ft. Bliss. As a result of the Battle of Glorieta Pass, New Mexico was saved for the Union, and Sibley's forces fell back in an easterly direction through Texas before the advance of Carleton's column of Californians.[11]

These engagements gave some immediacy to the comments of Congressman Edwards of New Hampshire during the debate on the Pacific Railroad bill:

> "If this Union is to be preserved, if we are successfully to combat the difficulties around us, if we are to crush out

[11] See generally M. Hall, Sibley's New Mexico Campaign (1960); W. Whitford, The Colorado Volunteers in the Civil War (1971). The Confederate forces in New Mexico have since been lauded for their courage, if not for their optimism. One Southern commander is reported to have responded to a Union demand for surrender: "We will fight first and surrender afterwards!" G. Harris, A Tale of Men Who Knew Not Fear 18 (1935).

> this rebellion against the lawful authority of the Government, and are to have an entire restoration, it becomes us, with statesmanlike prudence and sagacity, to look carefully into the future, and to guard in advance against all possible considerations which may threaten the dismemberment of the country hereafter." Cong. Globe, 37th Cong., 2d Sess., 1703 (1862).

As is often the case, war spurs technological development, and Congress enacted the Union Pacific Act in May 1862. Perhaps not coincidentally, the Homestead Act was passed the same month.

The Union Pacific Act specified a route west from the 100th meridian, between a site in the Platte River Valley near the cities of Kearney and North Platte, Neb., to California. The original plan was for five eastern terminals located at various points on or near the Missouri River; but in fact Omaha was the only terminal built according to the plan.[12]

The land grants made by the Union Pacific Act included all

---

[12] The choice of the 100th meridian as the eastern end of the rail line was not without significance. The 100th meridian has been traditionally thought of as the parallel west of which it was impossible to raise most crops without irrigation. Omaha, for example, 300 miles to the east, receives an average of 25 inches of rainfall per year, while Sidney, Neb., west of the meridian and near the Wyoming line, receives an average of only 16 inches of rainfall each year. Thus, in a sense the 100th meridian represented, not only to travelers but also to potential settlers, the eastern boundary of the amorphous "Great American Desert."

"In general, historians have been content to postulate that American institutions, orientations, and habits of thought which developed east of the 100th meridian maintained their form and retained their content after reaching the West, whereas in fact a good many important ones did not. In the second place, historians have generally been ignorant of or incurious about natural conditions that determine life in the West, differentiate it from other sections, and have given it different orientations." Introduction of Bernard DeVoto to W. Stegner, Beyond the Hundredth Meridian xviii–xix (1954).

the odd-numbered lots within 10 miles on either side of the track. When the Union Pacific's original subscription drive for private investment proved a failure, the land grant was doubled by extending the checkerboard grants to 20 miles on either side of the track. Private investment was still sluggish, and construction did not begin until July 1865, three months after the cessation of Civil War hostilities.[13] Thus began a race with the Central Pacific Railroad, which was laying track eastward from Sacramento, for the Government land grants which went with each mile of track laid. The race culminated in the driving of the golden spike at Promontory, Utah, on May 10, 1869.

## II

This case is the modern legacy of these early grants. Petitioners, the Leo Sheep Co. and the Palm Livestock Co., are the Union Pacific Railroad's successors in fee to specific odd-

---

[13] Construction would not have begun then without the Crédit Mobilier, a limited-liability company that was essentially owned by the promoters and investors of the Union Pacific. One of these investors, Oakes Ames, a wealthy New England shovel maker, was a substantial investor in Crédit Mobilier and also a Member of Congress. Crédit Mobilier contracted with the Union Pacific to build portions of the road, and by 1866 several individuals were large investors in both corporations. Allegations of improper use of funds and bribery of Members of the House of Representatives led to the appointment of a special congressional investigatory committee that during 1872 and 1873 looked into the affairs of Crédit Mobilier. These investigations revealed improprieties on the part of more than one Member of Congress, and the committee recommended that Ames be expelled from Congress. The investigation also touched on the career of a future President. See M. Leech & H. Brown, The Garfield Orbit (1978).

In 1872 the House of Representatives enacted a resolution condemning the policy of granting subsidies of public lands to railroads. Cong. Globe, 42d Cong., 2d Sess., 1585 (1872); see *Great Northern R. Co.* v. *United States,* 315 U. S. 262, 273-274 (1942). Of course, the reaction of the public or of Congress a decade after the enactment of the Union Pacific Act to the conduct of those associated with the Union Pacific cannot influence our interpretation of that Act today.

numbered sections of land in Carbon County, Wyo. These sections lie to the east and south of the Seminoe Reservoir, an area that is used by the public for fishing and hunting. Because of the checkerboard configuration, it is physically impossible to enter the Seminoe Reservoir sector from this direction without some minimum physical intrusion upon private land. In the years immediately preceding this litigation, the Government had received complaints that private owners were denying access over their lands to the reservoir area or requiring the payment of access fees. After negotiation with these owners failed, the Government cleared a dirt road extending from a local county road to the reservoir across both public domain lands and fee lands of the Leo Sheep Co. It also erected signs inviting the public to use the road as a route to the reservoir.

Petitioners initiated this action pursuant to 28 U. S. C. § 2409a to quiet title against the United States. The District Court granted petitioners' motion for summary judgment, but was reversed on appeal by the Court of Appeals for the Tenth Circuit. 570 F. 2d 881. The latter court concluded that when Congress granted land to the Union Pacific Railroad, it implicitly reserved an easement to pass over the odd-numbered sections in order to reach the even-numbered sections that were held by the Government. Because this holding affects property rights in 150 million acres of land in the Western United States, we granted certiorari, 439 U. S. 817, and now reverse.

The Government does not claim that there is any express reservation of an easement in the Union Pacific Act that would authorize the construction of a public road on the Leo Sheep Co.'s property. Section 3 of the 1862 Act sets out a few specific reservations to the "checkerboard" grant. The grant was not to include land "sold, reserved, or otherwise disposed of by the United States," such as land to which there were homestead claims. 12 Stat. 492. Mineral lands were also excepted from the operation of the Act. *Ibid.*

Given the existence of such explicit exceptions, this Court has in the past refused to add to this list by divining some "implicit" congressional intent. In *Missouri, K. & T. R. Co.* v. *Kansas Pacific R. Co.*, 97 U. S. 491, 497 (1878), for example, this Court in an opinion by Mr. Justice Field noted that the intent of Congress in making the Union Pacific grants was clear: "It was to aid in the construction of the road by a gift of lands along its route, without reservation of rights, except such as were specifically mentioned . . . ." The Court held that although a railroad right-of-way under the grant may not have been located until years after 1862, by the clear terms of the Act only claims established prior to 1862 overrode the railroad grant; conflicting claims arising after that time could not be given effect. To overcome the lack of support in the Act itself, the Government here argues that the implicit reservation of the asserted easement is established by "settled rules of property law" and by the Unlawful Inclosures of Public Lands Act of 1885.

Where a private landowner conveys to another individual a portion of his lands in a certain area and retains the rest, it is presumed at common law that the grantor has reserved an easement to pass over the granted property if such passage is necessary to reach the retained property. These rights-of-way are referred to as "easements by necessity." [14] There are two problems with the Government's reliance on that notion in this case. First of all, whatever right of passage a private landowner might have, it is not at all clear that it would include the right to construct a road for public access to a recreational area.[15] More importantly, the easement is not

[14] See generally 3 R. Powell, Real Property ¶ 410 (1978). For a recent discussion and application of the "easement by necessity" doctrine, see *Hollywyle Assn., Inc.* v. *Hollister*, 164 Conn. 389, 324 A. 2d 247 (1973).

[15] It is very unlikely that Congress in 1862 contemplated this type of intrusion, and it could not reasonably be maintained that failure to provide access to the public at large would render the Seminoe Reservoir land useless. Yet these are precisely the considerations that define the

actually a matter of necessity in this case because the Government has the power of eminent domain. Jurisdictions have generally seen eminent domain and easements by necessity as alternative ways to effect the same result. For example, the State of Wyoming no longer recognizes the common-law easement by necessity in cases involving landlocked estates. It provides instead for a procedure whereby the landlocked owner can have an access route condemned on his behalf upon payment of the necessary compensation to the owner of the servient estate.[16] For similar reasons other state courts have held that the "easement by necessity" doctrine is not available to the sovereign.[17]

The applicability of the doctrine of easement by necessity in this case is, therefore, somewhat strained, and ultimately of

scope of easements by necessity. As one commentator relied on by the Government notes:

"As the name implies, these easements are the product of situations where the usefulness of land is at stake. The scope of the resultant easement embodies the best judgment of the court as to what is reasonably essential to the land's use. . . . Changes in the dominant parcel's use exert some, but not a great influence, in determining the scope of such easements." 3 Powell, *supra* n. 14, ¶ 416, pp. 34–203 to 34–204 (footnotes omitted). See, *e. g., Higbee Fishing Club* v. *Atlantic City Electric Co.*, 78 N. J. Eq. 434, 79 A. 326 (1911) (footpath, not roadway, proper scope of easement where use of dominant estate as clubhouse could not have been contemplated by parties to original grant).

[16] Wyo. Stat. §§ 24-9-101 to 24-9-104 (1977); see *Snell* v. *Ruppert*, 541 P. 2d 1042, 1046 (Wyo. 1975) (statute "offers complete relief to the shut-in landowner and covers the whole subject matter"; "[i]f a statute covers a whole subject matter, the abrogation of the common law on the same subject will necessarily be implied"). See also, *e. g., Quinn* v. *Holly*, 244 Miss. 808, 146 So. 2d 357 (1962). In light of the history of public land grants related in Part I of this opinion, it is not surprising that "private" eminent domain statutes like that of Wyoming are most prevalent in the Western United States.

[17] *E. g., State* v. *Black Bros.*, 116 Tex. 615, 629–630, 297 S. W. 213, 218–219 (1927); see *Pearne* v. *Coal Creek Min. & Mfg. Co.*, 90 Tenn. 619, 627–628, 18 S. W. 402, 404 (1891).

little significance. The pertinent inquiry in this case is the intent of Congress when it granted land to the Union Pacific in 1862. The 1862 Act specifically listed reservations to the grant, and we do not find the tenuous relevance of the common-law doctrine of ways of necessity sufficient to overcome the inference prompted by the omission of any reference to the reserved right asserted by the Government in this case. It is possible that Congress gave the problem of access little thought; but it is at least as likely that the thought which was given focused on negotiation, reciprocity considerations, and the power of eminent domain as obvious devices for ameliorating disputes.[18]  So both as a matter of common-law

---

[18] The intimations that can be found in the Congressional Globe are that there was no commonly understood reservation by the Government of the right to enter upon granted lands and construct a public road. Representative Cradlebaugh of Nevada offered an amendment to what became the Union Pacific Act of 1862 that would have reserved the right to the public to enter granted land and prospect for valuable minerals upon the payment of adequate compensation to the owner. The proposed amendment was defeated. The only Representative other than Cradlebaugh who spoke to it, Representative Sargent of California, stated:

"The amendment of the gentleman proposes to allow the public to enter upon the lands of any man, whether they be mineral lands or not, and prospect for gold and silver, and as compensation proposes some loose method of payment for the injuries inflicted. Now, sir, it may turn out that the man who thus commits the injuries may be utterly insolvent, not able to pay a dollar, and how is the owner of the property to be compensated for tearing down his dwellings, rooting up his orchards, and destroying his crops?" Cong. Globe, 37th Cong., 2d Sess., 1910 (1862).

In debates on an earlier Pacific Railroad bill it was explicitly suggested that there be "a reservation in every grant of land that [the Government] shall have a right to go through it, and take it at proper prices to be paid hereafter." The author of this proposal, Senator Simmons of Rhode Island, lamented the lack of such a reservation in the bill under consideration. Cong. Globe, 35th Cong., 2d Sess., 579 (1859). Apparently the intended purpose of this proposed reservation was to permit railroads to obtain rights-of-way through granted property at the Government's behest. Senator Simmons' comments are somewhat confused, but

doctrine and as a matter of construing congressional intent, we are unwilling to imply rights-of-way, with the substantial impact that such implication would have on property rights granted over 100 years ago, in the absence of a stronger case for their implication than the Government makes here.

The Government would have us decide this case on the basis of the familiar canon of construction that, when grants to federal lands are at issue, any doubts "are resolved for the Government, not against it." *Andrus* v. *Charlestone Stone Products Co.,* 436 U. S. 604, 617 (1978). But this Court long ago declined to apply this canon in its full vigor to grants under the railroad Acts. In 1885 this Court observed:

> "The solution of [ownership] questions [involving the railroad grants] depends, of course, upon the construction given to the acts making the grants; and they are to receive such a construction as will carry out the intent of Congress, however difficult it might be to give full effect to the language used if the grants were by instruments of private conveyance. To ascertain that intent we must look to the condition of the country when the acts were passed, as well as to the purpose declared on their face, and read all parts of them together." *Winona & St. Peter R. Co.* v. *Barney,* 113 U. S. 618, 625 (1885).

The Court harmonized the longstanding rule enunciated most recently in *Andrus, supra,* with the doctrine of *Winona* in *United States* v. *Denver & Rio Grande R. Co.,* 150 U. S. 1, 14 (1893), when it said:

> "It is undoubtedly, as urged by the plaintiffs in error, the well-settled rule of this court that public grants are construed strictly against the grantees, but they are not to be so construed as to defeat the intent of the legisla-

---

they certainly do not evince any prevailing assumption that the Government implicitly reserved a right-of-way through granted lands.

ture, or to withhold what is given either expressly or by necessary or fair implication. . . .

". . . When an act, operating as a general law, and manifesting clearly the intention of Congress to secure public advantages, or to subserve the public interests and welfare by means of benefits more or less valuable, offers to individuals or to corporations as an inducement to undertake and accomplish great and expensive enterprises or works of a *quasi* public character in or through an immense and undeveloped public domain, such legislation stands upon a somewhat different footing from merely a private grant, and should receive at the hands of the court a more liberal construction in favor of the purposes for which it was enacted."

Thus, invocation of the canon reiterated in *Andrus* does little to advance the Government's position in this case.

Nor do we find the Unlawful Inclosures of Public Lands Act of 1885 of any significance in this controversy. That Act was a response to the "range wars," the legendary struggle between cattlemen and farmers during the last half of the 19th century. Cattlemen had entered Kansas, Nebraska, and the Dakota Territory before other settlers, and they grazed their herds freely on public lands with the Federal Government's acquiescence.[19] To maintain their dominion over the ranges, cattlemen used homestead and pre-emption laws to gain control of water sources in the range lands. With monopoly control of such sources, the cattlemen found that ownership over a relatively small area might yield effective control of thousands of acres of grassland. Another exclusionary technique was the illegal fencing of public lands, which was often the product of the checkerboard pattern of railroad grants. By placing fences near the borders of their parts of the

---

[19] M. Clawson & B. Held, The Federal Lands 57–58, 84–85 (1957).

checkerboard, cattlemen could fence in thousands of acres of public lands. Reports of the Secretary of the Interior indicated that vast areas of public grazing land had been preempted by such fencing patterns.[20] In response Congress passed the Unlawful Inclosures Act of 1885.[21]

Section 1 of the Unlawful Inclosures Act states that "[a]ll inclosures of any public lands . . . constructed by any person . . . to any of which land included within the inclosure the person . . . had no claim or color of title made or acquired in good faith . . . are declared to be unlawful." 23 Stat. 321, 43 U. S. C. § 1061. Section 3 further provides:

> "No person, by force, threats, intimidation, or by any fencing or inclosing, or any other unlawful means, shall prevent or obstruct, or shall combine and confederate with others to prevent or obstruct, any person from peaceably entering upon or establishing a settlement or residence on any tract of public land subject to settlement or entry under the public land laws of the United States, or shall prevent or obstruct free passage or transit over or through the public lands: *Provided,* This section shall not be held to affect the right or title of persons, who have gone upon, improved, or occupied said lands under the land laws of the United States, claiming title thereto, in good faith." 23 Stat. 322, 43 U. S. C. § 1063.

The Government argues that the prohibitions of this Act should somehow be read to include the Leo Sheep Co.'s refusal to acquiesce in a public road over its property, and that such a conclusion is supported by this Court's opinion in

---

[20] H. R. Rep. No. 1325, 48th Cong., 1st Sess. (1884). For example, in a letter to the House of Representatives the Secretary related two instances in Colorado where cattle companies fenced in more than one million acres each. Congressional concern was heightened by the fact that these and other cattle corporations were foreign owned. *Id.*, at 2.

[21] 23 Stat. 321, as amended, 43 U. S. C. § 1061 *et seq.*

*Camfield* v. *United States*, 167 U. S. 518 (1897). We find, however, that *Camfield* does not afford the support that the Government seeks. That case involved a fence that was constructed on odd-numbered lots so as to enclose 20,000 acres of public land, thereby appropriating it to the exclusive use of Camfield and his associates. This Court analyzed the fence from the perspective of nuisance law, and concluded that the Unlawful Inclosures Act was an appropriate exercise of the police power.

There is nothing, however, in the *Camfield* opinion to suggest that the Government has the authority asserted here. In fact, the Court affirmed the grantee's right to fence completely his own land.

> "So long as the individual proprietor confines his enclosure to his own land, .the Government has no right to complain, since he is entitled to the complete and exclusive enjoyment of it, regardless of any detriment to his neighbor; but when, under the guise of enclosing his own land, he builds a fence which is useless for that purpose, and can only have been intended to enclose the lands of the Government, he is plainly within the statute, and is guilty of an unwarrantable appropriation of that which belongs to the public at large." *Id.*, at 528.

Obviously, if odd-numbered lots are individually fenced, the access to even-numbered lots is obstructed. Yet the *Camfield* Court found that this was not a violation of the Unlawful Inclosures Act. In that light we cannot see how the Leo Sheep Co.'s unwillingness to entertain a public road without compensation can be a violation of that Act. It is certainly true that the problem we confront today was not a matter of great concern during the time the 1862 railroad grants were made. The order of the day was the open range—barbed wire had not made its presence felt—and the type of incursions on

private property necessary to reach public land was not such an interference that litigation would serve any motive other than spite.[22]   Congress obviously believed that when development came, it would occur in a parallel fashion on adjoining public and private lands and that the process of subdivision, organization of a polity, and the ordinary pressures of commercial and social intercourse would work itself into a pattern of access roads.[23]   The *Camfield* case expresses similar sentiments.   After the passage quoted above conceding the authority of a private landowner to fence the entire perimeter of his odd-numbered lot, the Court opined that such authority was of little practical significance "since a separate enclosure of each section would only become desirable when the country had been settled, and roads had been built which would give access to each section." *Ibid.* It is some testament to common sense that the present case is virtually unprecedented,

---

[22] There were exceptions, one of which, *Buford* v. *Houtz,* 133 U. S. 320 (1890), reached this Court. See n. 24, *infra.*

[23] This expectation was fostered by the general land-grant scheme. Each block in the checkerboard was a square mile—640 acres.   The public lots were open to homesteading, with 160 acres the maximum allowable claim under the Homestead Act.   Act of May 20, 1862, 12 Stat. 392.   The Union Pacific was required by the 1862 Act to sell or otherwise dispose of the land granted to it within three years after completion of the entire road, with lands not so disposed of within that period subject to homesteading and pre-emption.   Thus, in 1862, the process of subdivision was perceived, to a great degree, as inevitable.

During the 1850 debates concerning the Illinois Central Railroad, Senator Cass of Michigan outlined the dynamics that were presumed to underlie the system of checkerboard grants: "In all the new portions of the United States this Government owns a large proportion of the property.   They sell it.   They offer it for sale.   It is surveyed, thrown into market, and emigration is invited.   Tract after tract is sold, roads are made, villages and towns are built up, and all the improvements that can be of value to a country go on and increase the value of the lands . . . ." Cong. Globe, 31st Cong., 1st Sess., 846 (1850).

and that in the 117 years since the grants were made, litigation over access questions generally has been rare.

Nonetheless, the present times are litigious ones and the 37th Congress did not anticipate our plight. Generations of land patents have issued without any express reservation of the right now claimed by the Government. Nor has a similar right been asserted before.[24] When the Secretary of the Interior has discussed access rights, his discussion has been colored by the assumption that those rights had to be purchased.[25] This Court has traditionally recognized the special need for certainty and predictability where land titles are concerned, and we are unwilling to upset settled expectations to accommodate some ill-defined power to construct public

---

[24] This distinguishes the instant case from *Buford* v. *Houtz, supra.* The appellants there were a group of cattle ranchers seeking, *inter alia,* an injunction against sheep ranchers who moved their herds across odd-numbered lots held by the appellants in order to graze their sheep on even-numbered public lots. This Court denied the requested relief because it was contrary to a century-old grazing custom. The Court also was influenced by the sheep ranchers' lack of any alternative.

"Upon the whole, we see no equity in the relief sought by the appellants in this case, which undertakes to deprive the defendants of this recognized right to permit their cattle to run at large over the lands of the United States and feed upon the grasses found in them, while, under pretence of owning a small proportion of the land which is the subject of controversy, they themselves obtain the monopoly of this valuable privilege." 133 U. S., at 332.

Here neither custom nor necessity supports the Government.

[25] In 1887 the Secretary of the Interior recommended that Congress enact legislation providing for a public road around each section of public land to provide access to the various public lots in the checkerboard scheme. The Secretary also recommended that to the extent building these roads required the taking of property that had passed to private individuals, "the bill should provide for necessary compensation." 1 Report of the Secretary of the Interior for Fiscal Year Ending June 30, 1887, p. 15 (1887); see also 1 Report of the Secretary of the Interior for Fiscal Year Ending June 30, 1888, p. xvii (1888).

thoroughfares without compensation.[26]   The judgment of the Court of Appeals for the Tenth Circuit is accordingly

*Reversed.*

MR. JUSTICE WHITE took no part in the consideration or decision of this case.

---

[26] See, *e. g., Louisiana* v. *Garfield,* 211 U. S. 70, 76 (1908); *Iron Silver Mining Co.* v. *Elgin Mining & Smelting Co.,* 118 U. S. 196, 207–208 (1886); *Doolittle's Lessee* v. *Bryan,* 14 How. 563, 567 (1853).