POVERTY FLATS LAND & CATTLE CO., a New Mexico corporation, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

No. 84–1515.

United States Court of Appeals, Tenth Circuit.

April 11, 1986.

William M. Kerr, Jr., Midland, Tex. (Rod M. Schumacher, Roswell, N.M., and William Monroe Kerr, with him on brief), Atwood, Malone, Mann & Cooter, P.A., Roswell, N.M., and Kerr, Fitz-Gerald & Kerr, Midland, Tex., of counsel), for plaintiff-appellant.

Ellen J. Durkee, Atty., Dept. of Justice, Washington, D.C. (F. Henry Habicht, II, Asst. Atty. Gen., Washington, D.C., William L. Lutz, U.S. Atty. and Raymond Hamilton, Asst. U.S. Atty., Albuquerque, N.M., David C. Shilton, Atty., Dept. of Justice, Washington, D.C., with him on brief), for defendant-appellee.

Before SEYMOUR, SETH and ANDERSON, Circuit Judges.

SETH, Circuit Judge.

This appeal arose from an action to quiet title to ranch land in New Mexico brought pursuant to 28 U.S.C. § 2409a(a) and 28 U.S.C. § 1346(f). The plaintiff's title is derived from a patent issued by the Government in 1970. Plaintiff acquired a portion of the patented area. The issue concerns the scope and meaning of a reservation of minerals retained by the Government in the patent. More particularly the issue is whether "caliche" is a substance which was within the reservation as a "mineral."

On a previous appeal (706 F.2d 1078 (10th Cir.)), we remanded the case to the trial court to resolve a statute of limitations issue. The trial court in its Conclusions of Law stated in part on remand:

"This Court, after a careful review of all the testimony adduced by both parties, simply cannot conclude that the Plaintiff, or its predecessors in interest either knew or should have known that the United States claimed the caliche at the time of the reservation."

This determination placed the action within the permitted time period, but it had other significant implications hereinafter referred to.

The patent reservation reads:

"EXCEPTING AND RESERVING TO THE UNITED STATES

. . . .

"2. All mineral deposits in the lands so patented, and to it, or persons authorized by it, the right to prospect, mine and remove such deposits from the same under the applicable law;"

The patent was issued pursuant to exchange provisions of the Taylor Grazing Act since repealed. The Act provided for various types of exchanges of land between the United States Government and individuals or private entities and for other exchanges.

The trial court concluded as a matter of law that "caliche" was included in the reservation of "minerals" to the Government. There was no express finding of fact that "caliche" was a mineral. The plaintiff has taken this appeal.

"Caliche" consists of small rocks, dust, soil and sand which had deposited in and on its carbonates washed from the air and carried into the crevices and pores of the rocks and soil. The carbonates were deposited when the very limited moisture evaporated. The resultant salts solidified to a greater or lesser extent around the soil and rock particles to form a matrix. The caliche is made up at any given time in its development almost entirely from the original rocks and soil which were there originally. It is thus of a varied composition except for the deposited carbonates which hold together the particles to create stratas of varying hardness.

*Source Of Plaintiff's Title And Discretion Of The Secretary Of The Interior*

The patent to the land here concerned, given by the Government to plaintiff's predecessor in title, was to carry out an equal value land exchange between an individual(s) and the Government. Such an exchange was expressly provided for in

Section 8 of the Taylor Grazing Act as it then existed as 43 U.S.C. § 315g but repealed in 1976, 90 Stat. 2792. Section 8(d) in part read as follows:

"Provided, That either party to an exchange based upon equal value under this section may make reservations of minerals, easements, or rights of use. Where reservations are made in lands conveyed either to or by the United States the right to enjoy them shall be subject to such reasonable conditions respecting ingress and egress and the use of the surface of the land as may be deemed necessary. Where mineral reservations are made by the grantor in lands conveyed by the United States, it shall be so stipulated in the patent...."

The statutory provision was unique in that it was then apparently the only provision in the statutory authorizations for patents to individuals of Government lands wherein the nature and extent of the mineral reservation (and other reservations) in the patent were left to the complete discretion of the Secretary of Interior. The reservation was a matter to be negotiated between the Secretary and the individual in the exchange apparently to assist in arriving at an exchange of equal value by permitting negotiation as to all elements of value, and to meet unusual circumstances. *See National Forest Preservation Group v. Butz,* 485 F.2d 408 (9th Cir.). There is no standard provided in the statute, no form, and no restrictions on the reservations. It is not related to any other provision in the Taylor Grazing Act and to no other acts wherein a mineral reservation is mandated.

The unusual statutory provision for complete discretion in the Secretary is significant in our consideration of the issues in this appeal because it eliminates the factor of the intention of Congress as to the scope of the reservation which is sought to be ascertained in other situations where a mandatory reservation is provided. This absence of a Congressional intent element removes a very significant factor relied on by the Supreme Court in *Watt v. Western Nuclear, Inc.,* 462 U.S. 36, 103 S.Ct. 2218, 76 L.Ed.2d 400, hereinafter considered, wherein a required statutory reservation under a Homestead Act was in issue.

We were able to look to "the purpose of the Act" intent in our analysis in *Millsap v. Andrus,* 717 F.2d 1326 (10th Cir.), and to seek Congressional intent as to the meaning of "other minerals" in a pre-1955 reservation.

This discretion in the Secretary and also in the individual with whom the trade is made, together with the varied interpretations and changing policies of the Interior Department, makes reliance on similar language or wording in other reservations of questionable worth. *See also* the General Exchange Act of 1922, 16 U.S.C. § 486.

*Plaintiff And Predecessors Did Not Know Of Government's Claim*

As mentioned, the trial court determined that neither plaintiff-appellant nor its predecessors in interest knew or should have known of the claim of the United States to the caliche on the land conveyed by it in the exchange until about ten years after the exchange. This was the specific finding required to resolve the jurisdictional issue and in reality is a finding of fact significant on other issues as well.

The Government on this appeal seeks to overcome this finding by its argument that the grantee knew of old caliche pits on the lands and points out that its appraisal referred to these 40-year-old pits as "mineral activity." However, the record shows that the pits were made when the Government owned both the surface and the minerals and thus do not indicate whether they were part of the minerals or not. The appraisal was an internal report and was not made known to the prospective grantee. The case on appeal thus has to be examined with this finding as a factual basis for several issues.

The plaintiff found in 1981 that Oilfield Construction Company had entered plaintiff's land and had or was removing caliche from the land covered by the patent. It appears that the next month the Company

obtained a sales contract from the BLM for this caliche. This delay was permitted by the local BLM office. The trial court found:

"13. The entry by Oilfield Construction and its subsequent mining of caliche in June of 1981 was the first occasion that the Plaintiff became aware that the United States claimed an interest in caliche as a reserved mineral under the original Patent."

The trial court in its findings stated that the testimony of the patentee was that "caliche" had not been mentioned during the negotiations.

### A Change In Policy By The BLM

The finding that the grantee at the time of the exchange did not know nor should have known of the claim by the United States that caliche was sought to be reserved as a mineral is also significant on whether the Government some ten years after the patent can disclose for the first time a theretofore internal only policy change (if it even existed in that form) or an internal departmental discussion position that caliche was a "mineral," and to thereby seek to change the scope and extent of the mineral reservation it had obtained. Thus it is not only that the plaintiff did not know of the policy change but more importantly it was not made public as such a change.

As hereinafter further considered, all parties acknowledge that at the time the patent issued there were no administrative decisions and no judicial determinations that caliche was locatable under the mining laws as a valuable "mineral."

The record demonstrates that after the exchange the BLM official in Roswell decided to construe "mineral" reservations of the type here concerned in a different way than theretofore. This difference was to include caliche as a "mineral" in the reservations of minerals which had not theretofore been done. This change was not made known publicly and the Government points to no notice or change in the regulations. As to the position prior to the change, the record contains a letter from the Santa Fe, New Mexico BLM office to the Roswell District Manager dated August 1961 referring to the Surface Resources Act of 1955 (Act of July 23, 1955) and the Regulations. This letter in part states:

"Common varieties is defined in 43 CFR 185.121(b). There is no evidence that caliche does not meet this definition or that it cannot be disposed of under the regulations of 43 CFR 259."

### What Of The Surface Resources Act And The Common Occurrence Of Caliche?

As to the common occurrence aspect generally, the expert witness for the Government testified in part:

"Such caliche-capped land forms [caprock layers on tablelands and plateaus] are very extensive along the Rio Grande and Pecos Valleys and the Southern High Plains area east of the Pecos.... That would be in Lea, Roosevelt, Curry Counties and into adjacent areas of Texas."

The witness also testified that caliche occurred in the Southwest part of the United States, Arizona, New Mexico, Texas, Nevada, and Mexico.

As to the ranch in issue the witness for the plaintiff testified that the caliche was not in isolated spots but was generally throughout the area. He was asked:

"You mean like miles and miles and miles, square miles?"

And he answered, "Yes sir."

### The Procedure After The Policy Change

■ The removal of caliche by Oilfield Construction was pursuant to what the BLM termed a "Vegetative of Mineral Material Negotiated Cash Sale Contract." This method for cash sales was described in an undated "Notice" issued by the Roswell BLM office. However, the significant part of this Notice (Defendant's Exhibit G) is the statement therein referring to the Surface Resources Act as permitting the removal of "mineral materials" when authorized by the BLM. The caliche was sold as a common surface material not treated as a "mineral." The Notice describes ca-

liche as a "mineral material" thereby attempting to create a category of materials which are not "common varieties" and are not "minerals." This category apparently is to preserve the appearance that caliche is in the "mineral" category to come within the mineral reservations in the patents, but is a "material" to permit disposal under the Surface Resources Act. However, there is really no room for such a category. The position was inconsistent. Caliche cannot be both fish and fowl. The term "mineral materials" does appear in 30 U.S.C. § 611 but only to situations where the Government owns the surface and the minerals.

■ The Surface Resources Act of 1955 (30 U.S.C. § 611) was intended to remove a large group of "common materials" from the "locatable minerals" category. This was to prevent mining locations on public lands containing these materials being made with a view to ultimately obtaining title to the lands. There was a perceived abuse of the mining laws to so obtain title but to ultimately put the land to other purposes. Common "materials" were thus removed from the application of the mining laws and put under a permit system. The Act provides:

"No deposit of common varieties of sand, stone, gravel, pumice, pumicite, or cinders and no deposit of petrified wood shall be deemed a valuable mineral deposit within the meaning of the mining laws of the United States so as to give effective validity to any mining claim hereafter located under such mining laws...."

The position in this case of the Government is contrary to the purpose of the Surface Resources Act in that its effect would seem to place caliche in the locatable minerals category. It is also contrary to instructions given to a local office in the area here concerned as above described. The Government here urges it is "valuable" and thus mining locations could have been made for it. Again, caliche had not then been held administratively or by court decisions to be a locatable mineral.

*The Significance Of The Supreme Court Opinion In Watt v. Western Nuclear*

■ It is necessary to consider at some length the Supreme Court decision in *Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 103 S.Ct. 2218, 76 L.Ed.2d 400. The case concerned a gravel pit of some fourteen or fifteen acres in extent on land which had been homesteaded under the Stock Raising Homestead Act of 1916 (43 U.S.C. § 291 (SFHA)). The pit was operated by the surface owner. The issue was whether gravel had been reserved to the Government by the reservation of "minerals" as mandated by that Act. The statutory requirement was that "all the coal and other minerals" be reserved and the patent for the land there in issue did so reserve "all the coal and other minerals." The Court decided that gravel was there a mineral reserved to the Government.

The Supreme Court in *Western Nuclear* to reach its conclusion used the parallel of locatable minerals under the mining laws and reserved minerals under the 1916 Homestead Act. The Court of this said:

"It is also highly pertinent that federal administrative and judicial decisions over the past half-century have consistently recognized that gravel deposits could be located under the general mining laws until common varieties of gravel were prospectively removed from the purview of those laws by the Surface Resources Act of 1955, 69 Stat. 368, ch. 375, § 3, 30 U.S.C. § 611."

462 U.S. at 57, 103 S.Ct. at 2230. And the Court on the same page again advances what appears to be its strongest point:

"Simply as a matter of consistent interpretation of statutes concerning the same subject matter, if gravel deposits constituted 'mineral deposits' that could be located under the mining laws, then presumptively gravel should constitute a 'mineral' reserved to the United States under the SRHA."

The Court so relied on the administrative decisions as to gravel and case law as to gravel as a "mineral" and more importantly as a locatable mineral. There were, of

course, no such decisions or case laws in existence as to caliche at the time the patent herein concerned was issued, and no such background existed. The Surface Resources Act was not involved in *Western Nuclear* as the patent was earlier and the Court did not consider the removal of common materials out of the locatable minerals category in reaching its decision.

The Supreme Court in *Western Nuclear* treats at some length the intended use of the land by the homesteaders for grazing and for farming. The Government makes a similar argument here. These persons the Court indicates in *Western Nuclear* were not interested in the minerals. Thus the Court in *Western Nuclear*, 462 U.S. at 53, 103 S.Ct. at 2228 states: "Congress plainly expected that the surface of SRHA lands would be used for stock raising and raising crops." The Court used this factor in arriving at the intention of Congress as to the reservation. The Court in other parts of the *Western Nuclear* opinion again refers to the expectation of Congress as to surface use by the homesteaders. Unfortunately this is a factor expressed by the Court which we cannot use in reaching a decision here although the plaintiff uses the land for ranching only. There can be no "expectation" of a particular surface use to be derived from the Taylor Grazing Act as to exchanges. Exchanges were really unrelated to the rest of the Act as the Government lands which were subject to exchange under section 8 did not have to be within a grazing district and did not have to have anything to do with grazing. They could be *any* unreserved public lands. The Act thus provided that the Secretary could issue a patent for "surveyed grazing district land or of unreserved surveyed public land."

Since the exchanges need not have been of grazing lands of the Government it cannot be assumed, as the Government does herein, that the surface use was preordained and some conclusion can be so derived. Nor can we say as the Court did in *Western Nuclear* that "the determination of whether a particlar substance is included in the surface estate or the mineral estate

should be made in the light of the use of the surface estate *that Congress contemplated."* (Emphasis added.) Under the Taylor Act the existing or expected surface use by the patentee could be anything, and no element of Congressional intent or expectation existed.

*The Protection Against Surface Damages As An Indication That Caliche Was Reserved*

■ The surface damage aspect of the removal of caliche in this instance is an uncertain element despite the Government's assertions in its brief that damages are provided for and the reservation of caliche does not present a problem for the surface owner. Thus it was in some way provided for, or anticipated in the exchange of equal value and hence a factor to assist in the construction of the reservation. The facts in this case do not support such a position. The recent pit area was not restored, the surface owner received no damages, and was not advised by the Government in advance. The Government in its brief places importance on the provision for surface damages in the Taylor Grazing Act but these have been repealed.

In the Sales Contract between the BLM and Oilfield the BLM was paid $43.30 for "restoration." This was at the rate of five cents per yard of material removed regardless of the surface area excavated, or other damages to the surface by way of roads. This was paid to the BLM and the surface owner received nothing. There was no reason why the excavator would pay the surface owner anything the way the matter was handled. The $43.30 would accomplish nothing according to the remarks of the trial court.

The expert witnesses herein placed emphasis on the chemical composition of caliche. The chemical identification of caliche was apparently considered to be a significant factor which in their view separated caliche from the dirt and stones which were acknowledged not to be within the reservation in the patent but which were part of the caliche. In *Western Nuclear* the Court

concluded that chemical composition was not an important consideration. Thus we should not place a significant weight, if any, on the chemical composition of the binding element which holds the dirt and rocks together to make caliche.

### Reserved Minerals Are Minerals Locatable Under The Mining Laws

■ The expert witnesses testified that caliche, or at least some part of the whole material has a particular chemical identification, that caliche is inorganic and it has value. This in their view made it a "mineral" within the terms of the reservation to establish Government ownership. This in our view is not enough when set against the other factors which need be considered.

As mentioned, the Court in *Western Nuclear* equated minerals reserved under the patent there concerned with minerals locatable under the general mining laws. As the Court said in *Western Nuclear:*

"It is also highly pertinent that federal administrative and judicial decisions over the past half-century have consistently recognized that gravel deposits could be located under the general mining laws....

"The treatment of gravel as a mineral under the general mining laws suggests that gravel should be similarly treated under the SRHA.... Simply as a matter of consistent interpretation of statutes concerning the same subject matter, if gravel deposits constituted 'mineral deposits' that could be located under the mining laws, then presumptively gravel should constitute a 'mineral' reserved to the United States under the SRHA."

As we have seen, caliche was not considered locatable under any administrative or court decision or practice and thus does not meet *Western Nuclear* 's basic requirement. Furthermore, it does not come within the definition of locatable minerals set forth in *Andrus v. Charlestone Stone Products Co.,* 436 U.S. 604, 98 S.Ct. 2002, 56 L.Ed.2d 570, wherein a patent application was denied.

The Court in *Andrus v. Charlestone* considered the two factors on which the experts based their opinion in the case before us—that caliche had a chemical identification hence was a "mineral" and had a value; as to whether this was sufficient to describe a locatable mineral the Court said in *Andrus:*

"This Court long ago recognized that the word 'mineral,' when used in an Act of Congress, cannot be given its broadest definition.... In the context of the 1872 mining law, similar conclusions must be drawn. As one court observed, if the term 'mineral' in the statute were construed to encompass all substances that are conceivably mineral, 'there would be justification for making mine locations on virtually every part of the earth's surface,' since 'a very high proportion of the substances of the earth are in that sense "mineral." ' ...

"... In order for a claim to be valid, the substance discovered must not only be a 'valuable mineral' within the dictionary definition of those words, but must also be the type of valuable mineral that the 1872 Congress intended to make the basis of a valid claim."

The above definition excludes caliche as a locatable mineral in a way to place it in a substance of common occurrence and not a valuable mineral under the 1872 Act.

We have referred to the vast areas covered by caliche in the Southwestern states. The Court considered the common occurrence issue in *United States v. Coleman,* 390 U.S. 599, 88 S.Ct. 1327, 20 L.Ed.2d 170, wherein an application for a patent to a mining claim was based on a discovery of a deposit of quartzite. The law then expressly permitted claims on lands "chiefly valuable for building stone." The patent was denied by the Secretary because the stone in his view could not be marketed at a profit and also because the deposit was a common variety of stone under 30 U.S.C. § 611 which would not qualify under the mining laws. The Court considered the profit element and then of the common variety basis for denial of patent said:

"We believe that the Secretary of the Interior was also correct in ruling that

'[i]n view of the immense quantities of identical stone found in the area outside the claims, the stone must be considered a "common variety" ' and thus must fall within the exclusionary language of § 3 of the 1955 Act, 69 Stat. 368, 30 U.S.C. § 611, which declares that '[a] deposit of common varieties of ... stone ... shall not be deemed a valuable mineral deposit within the meaning of the mining laws....' "

Thus despite the specific statute in *Coleman* permitting locations for stone "chiefly valuable as building stone," the Court decided that the common occurrence of the quartzite overcame the provision and placed the deposit under the Materials Act. The Court continued and found the Surface Act to control:

"The legislative history makes clear that this Act (30 U.S.C. § 611) was intended to remove common types of sand, gravel, and stone from the coverage of the mining laws, under which they served as a basis for claims to land patents, and to place the disposition of such materials under the Materials Act of 1947, 61 Stat. 681, 30 U.S.C. § 601, which provides for the sale of such materials without disposing of the land on which they are found."

*See also* 38 A.L.R.Fed. 457. The same consequences should follow in this appeal.

The record demonstrates that mining locations were not made on caliche; it is of the most common occurrence generally and extensively in very large areas in Southeastern New Mexico, Texas and Arizona and there in towns and cities. It is present on many square miles of the land in issue on the surface or under a few inches of other dirt or range grass. It has value as fill dirt and surfacing by reason of its geographical location to the road work where it is used, and a market for this use exists. Nothing can be extracted from it nor derived from it. It is used by reason of its physical characteristics only.

Caliche as demonstrated by the way it is formed, is the dirt and rocks which were at the surface ages ago and to which there has been added some carbonate material.

The caliche here mined was the loose "punky" variety and was not the harder defined strata. It cannot really be separately defined under the decisions from "dirts and rocks." Even if it could its occurrence over vast areas of the West must place it in the non-locatable common surface materials category and to exclude it from the reservation of minerals herein concerned.

New BLM views as to mineral reservations arrived at long after a patent issued, or revealed long after a patent issued, cannot change the title the patentee received under the then prevailing practice and decisions. The result otherwise would be a progressive series of changes dependent on the changes in the views of the officials or changes in personnel. Much has been said about the stability of titles and the Court in a case concerning such new views on the reservation of rights of way said in *Leo Sheep Co. v. United States*, 440 U.S. 668, 99 S.Ct. 1403, 59 L.Ed.2d 677:

"Generations of land patents have issued without any express reservation of the right now claimed by the Government. Nor has a similar right been asserted before. When the Secretary of the Interior has discussed access rights, his discussion has been colored by the assumption that those rights had to be purchased. This Court has traditionally recognized the special need for certainty and predictability where land titles are concerned, and we are unwilling to upset settled expectations to accommodate some ill-defined power to construct public thoroughfares without compensation."

The Court in *Leo Sheep Co. v. United States*, reached such a conclusion after citing *Andrus v. Charlestone Stone Products Co.*, 436 U.S. 604, 98 S.Ct. 2002, 56 L.Ed.2d 570, and stating the doctrine that when grants of federal lands are in issue doubts are resolved for the Government not against it. We must follow the admonitions of *Leo Sheep Co.* (as we have before), of *Western Nuclear*, of *Andrus v. Charlestone Stone Products Co.*, and

*United States v. Coleman,* and reverse the judgment of the trial court.

IT IS SO ORDERED.