**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AVISTA CORPORATION INC.,
    *Plaintiff-Appellant,*

v.

DORRIEN H. WOLFE; DIANE LARSON;
LESLIE RICKEY; SEAN M. STEPHENS;
JAMES R. DOYLE; BONNIE M.
SHARP; RONALD GENE SHARP;
RONALD SCOTT SHARP; GREGORY
STEWART SHARP; SANDERS COUNTY,
    *Defendants-Appellees.*

No. 07-35321

D.C. No.
CV-05-00201-JCL

OPINION

Appeal from the United States District Court
for the District of Montana
Jeremiah C. Lynch, Magistrate Judge, Presiding

Argued and Submitted August 11, 2008
Submission deferred August 11, 2008
Billings, Montana
Resubmitted December 11, 2008

Filed December 11, 2008

Before: Alex Kozinski, Chief Judge, Stephen Reinhardt and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Thomas

16257

## COUNSEL

Christian T. Nygren, Milodragovich, Dale, Steinbrenner & Nygren, Missoula, Montana, for appellant Avista Corp., Inc.

Gregory G. Schultz, Law Offices of Gregory Schultz, Missoula, Montana, for appellees Dorrien H. Wolfe, Diane Larson, Leslie Rickey, Sean M. Stephens, James R. Doyle, Bonnie M. Sharp, Ronald Gene Sharp, Ronald Scott Sharp, and Gregory Stewart Sharp.

Robert L. Zimmerman, Thompson Falls, Montana, for appellee Sanders County.

## OPINION

THOMAS, Circuit Judge:

This appeal presents the question of whether a court may retroactively declare a railroad right of way abandoned under the Abandoned Railway Right of Way Act. We conclude that the Act does not permit a *nunc pro tunc* abandonment declaration.

I

The storied Clark Fork River in Montana was formed from floods left by the last ice age and named by Meriwether Lewis during the expedition's return from the west coast. Its tributaries were celebrated by author Norman Maclean in his novella *A River Runs Through It*.[1] One of the most spectacular settings in the lower Clark Fork River valley is just over a

---

[1] *See also* Tracy Stone-Manning and Emily Miller, ed., *The River We Carry With Us* (Clark City Press, 2001) (collection of essays about the Clark Fork River).

one-lane bridge from Noxon, Montana, where the use of the rails ended and our controversy began.

The right of way at issue was granted to the Northern Pacific Railroad Company pursuant to the Northern Pacific Railroad Company Land Grant Act of 1864, 13 Stat. 365. The 1864 Act grew out of Congress' efforts in the mid-19th Century, intensified by the Gold Rush and the Civil War, to settle the American West and provide a direct link to California. *Leo Sheep Co. v. United States*, 440 U.S. 668, 670-77 (1979) (discussing in detail the history of this period of railroad development). Beginning in 1850, Congress passed a series of statutes granting public lands to private railroad companies to spur the construction of a cross-country railroad. *Great N. Ry. v. United States*, 315 U.S. 262, 273 & n.6 (1942). During this period, Congress often granted the railroads alternate sections of land along the right of way — resulting in a "checkerboard" of public and private lots — to further subsidize construction. *Leo Sheep Co.*, 440 U.S. at 672. Section 2 of the 1864 Act granted the Northern Pacific with a right of way extending "two hundred feet in width on each side of said railroad where it may pass through the public domain" from Lake Superior to the Puget Sound.

In subsequent years, the policy of granting "lavish" subsidies of public lands to railroads was met with increasing public disfavor. *Great N. Ry.*, 315 U.S. at 273-74. In the wake of the Credit Mobilier scandal in 1872, the House of Representatives adopted a resolution condemning the practice. Cong. Globe, 42d Cong., 2d Sess., 1585 (1872); *see Leo Sheep Co.*, 440 U.S. at 670-77; *Great N. Ry.*, 315 U.S. at 273-74. Although this marked the end of outright land grants, Congress continued to encourage development of the West through the General Railroad Right of Way Act of 1875, which provided easements to railroads across public lands. 43 U.S.C. § 934; *see also United States v. Union Pac. R. R.*, 353 U.S. 112, 119 (1957); *Great N. Ry.*, 315 U.S. at 273-76.

Northern Pacific, like other railroad companies granted land prior to 1875, held title in the right of way in the form of a "limited fee, made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted." *N. Pac. Ry. Co. v. Townsend*, 190 U.S. 267, 271 (1903). Under *Townsend*, land granted to a railroad would revert to the United States in the event the railroad stopped using the right of way for railroad purposes. *Id.* at 271-72. Because of the United States' potential interest, a railroad did not have the power to voluntarily transfer its interest in the right of way, nor could a private party acquire title to any portion of the right of way by adverse possession. *Id.*

Twenty years after *Townsend*, Congress enacted 43 U.S.C. § 912, known as the "Abandoned Railroad Right of Way Act," "to dispose of the abandoned railroad lands to which the United States held a right of reverter under *Townsend*." *Mauler v. Bayfield County*, 309 F.3d 997, 999 (7th Cir. 2002); Pub. L. No. 67-163, 42 Stat. 414 (1922). Section 912 provides in relevant part:

> Whenever public lands of the United States have been or may be granted to any railroad company for use as a right of way for its railroad or as sites for railroad structures of any kind, and use and occupancy of said lands for such purposes has ceased or shall hereafter cease, whether by forfeiture or by abandonment by said railroad company declared or decreed by a court of competent jurisdiction or by Act of Congress, then and thereupon all right, title, interest, and estate of the United States in said lands shall, except such part thereof as may be embraced in a public highway legally established within one year after the date of said decree or forfeiture or abandonment be transferred to and vested in any person, firm, or corporation, assigns, or successors in title and interest to whom or to which title of the

> United States may have been or may be granted,
> conveying or purporting to convey the whole of the
> legal subdivision or subdivisions traversed or occu-
> pied by such railroad or railroad structures of any
> kind as aforesaid . . . .

In short, § 912 requires that public lands given by the
United States for use as railroad rights of way be turned into
public highways within one year of their abandonment or be
given to the owners of the land traversed by the right of way.
Through the public highway exception, Congress sought to
ensure that former rights of way could continue to be used for
public transportation purposes. *Vieux v. E. Bay Reg'l Park
Dist.*, 906 F.2d 1330, 1335 (9th Cir. 1990).[2]

By the early 1880s, Northern Pacific had constructed its rail
line on the south bank of the Clark Fork River in northwestern
Montana. The rail line crossed what would later be surveyed
as Government Lot 5 of Section 24 in Township 26 North,
Range 33 West. In 1921, Arthur Hampton acquired the patent
to Government Lot 5 under the Homestead Act of 1862. The
patent purported to convey all of Government Lot 5, and con-
tained no mention of Northern Pacific's pre-existing right of
way.

In the early 1950s, Washington Water Power, a predecessor
of Avista, began construction of the Cabinet Gorge Dam in
Idaho, which created the Cabinet Gorge Reservoir on the
Clark Fork River in Idaho and Montana. To fill the reservoir,
Washington Water Power needed to secure either fee title to
the shoreline or water flowage easements over shoreline prop-

---

[2]Later, Congress would reverse course with the National Trails System
Improvements Act of 1988. Pub. L. No. 100-470; 102 Stat. 2281. Under
that Act, railroad rights of way abandoned after October 4, 1988 revert to
the United States, except to the extent that the right of way is embraced
in a public highway within a year following abandonment. 16 U.S.C.
§ 1248(c).

erty. Accordingly, in July 1952, Arthur Hampton's widow, Fanny Hampton, deeded "[a]ll that part of Government Lot 5 . . . lying north of the Northern Pacific right of way" to Washington Water Power. The conveyance included roughly .84 acres lying in between the Northern Pacific right of way and the Clark Fork River, as well as

> . . . all tenements, hereditaments, and appurtenances thereto belonging or in anywise appertaining, and the reversion or reversions, remainder and remainders, rents, issues, and profits thereof; and also all the estate, right, title, interest, right of dower and right of homestead, possession, claim, and demand whatsoever, as well in law as in equity [of Fanny Hampton] of, in or to the said premises, and every part and parcel thereof, with the appurtenances thereto belonging . . . .

One year later, in July 1953, Northern Pacific purported to relinquish to the United States a one hundred foot wide strip of the right of way, adjacent to the land conveyed to Washington Water Power by Fanny Hampton. The United States Bureau of Land Management sent a letter to Northern Pacific approving the relinquishment.

In July 1955, Northern Pacific and Washington Water Power entered into an agreement under which Northern Pacific would abandon its right of way on the south side of the Clark Fork and relocate its rail line to the north side of the river. The move would facilitate Washington Water Power's efforts to construct and maintain a hydro-electric power dam and reservoir, known as the Noxon Rapids Hydro-electric Development, on the river. Under the Relocation Agreement, Washington Water Power agreed to convey to Northern Pacific a portion of land on the north bank of the Clark Fork over which the relocated tracks would run and to construct the new rail line at its own expense. In exchange, Northern Pacific agreed to convey to Washington Water Power, "to the

extent that it may lawfully do so," the existing right of way and the trackage and improvements on it. The parties agreed that the conveyances would occur simultaneously after the new track was completed and Northern Pacific commenced service on the relocated line.

In two letters to Washington Water Power in March and April 1957, Northern Pacific reiterated its understanding that the right of way was to be abandoned upon relocation and that any use thereafter would be private use by Washington Water Power at its own expense. On August 26, 1957, the Montana Board of Railroad Commissioners ordered the Northern Pacific stations on the south bank of the Clark Fork at Tuscor and Noxon to be deemed "discontinued and abandoned." By late 1957, the relocation of Northern Pacific's rail line to the north side of the Clark Fork was completed and the railroad released its track and other personal property on the south side of the river to Washington Water Power.

In January 1958, Northern Pacific informed Washington Water Power that it was planning to install a derailment point east of the new line, after which Northern Pacific would "discontinue handling of traffic" along the southern right of way. Northern Pacific would deliver traffic consigned to Washington Water Power to a point immediately east of the derail "on what formerly was our main track." In February 1958, Washington Water Power proposed an arrangement under which the parties would divide responsibility for handling cars carrying materials for dam construction. "[T]he intention of the proposed arrangement was that the expense involved would be paid as nearly equally as possible by" Northern Pacific and Washington Water Power. Based on its calculations of the number of cars to be utilized and the traffic schedule, Washington Water Power proposed that Northern Pacific handle all traffic until September 30, 1958, after which Washington Water Power or its contractor would handle cars left by Northern Pacific at the derailment point.

Several months later, counsel for Washington Water Power expressed concern that title to the right of way might revert to the United States or vest in another third party upon abandonment by Northern Pacific. To avoid such a result, Washington Water Power requested Northern Pacific convey title to portions of its right of way, including the section crossing Government Lot 5, to Sanders County.

On October 1, 1958, Northern Pacific executed a quitclaim deed conveying its interest in those portions of the right of way to Sanders County for use as a highway. The conveyance states that the rail line had been relocated to the north side of the Clark Fork "on account of" the construction of the Noxon Rapids Hydro-electric Dam, and that the track and other structures on the right of way had been conveyed to Washington Water Power by a bill of sale. On the same date in a letter to Washington Water Power, Northern Pacific stated that effective October 1 only traffic directly consigned to Washington Water Power would pass on the southern rail line with "handling by your firm or agent" and that all other traffic would route through the new line.

Sanders County accepted the quitclaim deed on February 8, 1961, and public use of a road over the former right of way began in the early 1970s. On January 7, 2004, Sanders County quitclaimed to the descendants of Arthur and Fanny Hampton all of its interest in the right of way, reserving to itself two sixty-foot wide easements on the existing public roads. The Hampton descendants subsequently submitted a subdivision application for their section of Government Lot 5, including the former Northern Pacific right of way, to Sanders County. The final plat of the subdivision, "the Hamptons," was approved by Sanders County and filed on June 2, 2005.

Avista instituted this action in the District of Montana against the descendants of Arthur and Fanny Hampton ("Hamptons") and Sanders County[3] after learning of the pro-

_____

[3]Avista also named Burlington Northern and Santa Fe Railway Company, the successor to Northern Pacific, as a defendant. On August 7,

posed subdivision of Government Lot 5. Avista's Amended Complaint includes declaratory judgment and quiet title claims, seeking a declaration "regarding the ownership of the right of way traversing Government Lot 5" and quieting title in Sanders County. Avista also claims that Sanders County acted negligently by disclaiming its interest in the right-of-way to the Hamptons without following the Montana statutory requirements for the abandonment or sale of public land.[4]

The defendants collectively submitted a motion for summary judgment. In its cross-motion for summary judgment, Avista asserted that it has title to the centerline of the abandoned right of way as an adjacent landowner and successor in interest to Arthur Hampton. At the hearing on the summary judgment motions, the parties agreed that the authenticity of the documents in the record was not in dispute, that no additional relevant evidence was available and that therefore the court should decide the case on summary judgment and cancel the proposed trial.

The district court[5] granted the defendants' motion for summary judgment and denied Avista's cross-motion for summary judgment. The district court concluded that under § 912 the abandoned right of way transferred by operation of law to the Hamptons as successors in interest to Arthur Hampton. The court further held that even if Sanders County took title to the right of way pursuant to the § 912 exception for public highways, the County would only hold title to the land under-

_____

2006, the district court granted Burlington Northern's motion to dismiss without prejudice under Fed. R. Civ. P. 12(b)(6). Avista does not contest that order in this appeal.

[4]Avista's Amended Complaint also contains claims for adverse possession and a prescriptive easement. Avista has conceded that these claims are without merit.

[5]The parties consented to proceed before a United States Magistrate Judge, who entered judgment in the case. 28 U.S.C. § 636(c)(1).

lying the county roads, with the remainder reverting to the Hamptons. Finally, the court rejected Avista's so-called "centerline theory" on the grounds that Avista was neither a "successor in interest" to the Hampton estate nor an adjacent landowner. This timely appeal followed. We review a grant of summary judgment *de novo. Quest Comm'ns, Inc. v. Berkeley*, 433 F.3d 1253, 1256 (9th Cir. 2006).[6]

## II

Our consideration of the Abandoned Railroad Right of Way Act is guided by our decision in *Vieux*. In *Vieux*, we adopted an analysis of § 912 from *Idaho v. Oregon Short Line R.R.*, 617 F. Supp. 213, 216 (D. Idaho 1985), which paraphrased the statute's requirements:

1) Whenever public lands which have been [may be] granted to railroads for use as right-of-way

*and*

2) Use *and* occupancy of the land for *such purposes* has ceased

(a) by forfeiture
or (b) by abandonment

(1) as decreed by a court with jurisdiction
or (2) as declared by Act of Congress

---

[6]Sanders County contested Avista's standing to file a quiet title and declaratory judgment action. Avista's assertion of an ownership interest to the centerline provides it with standing to bring a quiet title and declaratory judgment action. Mont. Code Ann. § 70-28-101; *Sanders v. Yellowstone County*, 915 P.2d 196, 197 (Mont. 1996) (a plaintiff has standing to bring a quiet title action if he claims title to real estate against another person who claims an interest adverse to his own); *see also United States v. Carpenter*, 526 F.3d 1237, 1240 (9th Cir. 2008).

*then*

> 3) All right/title/interest of the United States in such lands shall be transferred to and vested in any person or entity to whom the United States has granted title by a conveyance purporting to convey lands traversed by a railroad.

*except*

> (a) Lands embraced in a public highway established within one year of declaration of forfeiture or abandonment [shall belong to the state] . . . .

*Id.* (emphasis in original); *Vieux*, 906 F.2d at 1337.

**[1]** Thus, *Vieux* first clarified that § 912 only applied to grants of public land. None of the § 912 procedures applied to railroad rights of way over privately-granted land.[7]

**[2]** Second, *Vieux* underscored that for any reversionary property rights to vest, the use and occupancy of the land must have ceased by abandonment or forfeiture *and* the abandonment or forfeiture must have been declared by Congress or a court of competent jurisdiction.

**[3]** Third, *Vieux* explained that vested reversionary rights are subject to divestment if a public highway is legally established within one year after the declaration of abandonment or forfeiture by Congress or a court of competent jurisdiction. *Id.* at 1337.

**[4]** Finally, if the two prerequisites have been satisfied, and a public highway is not established within a one year period

---

[7]Indeed, *Vieux* specifically noted that the "opinion does not affect the claims of those landowners who may have reversionary rights under private land grants." 906 F.2d at 1344.

after the declaration of forfeiture or abandonment, then the right of way "shall be transferred to and vested in any person or entity to whom the United States has granted title by a conveyance purporting to convey lands traversed by a railroad," *Oregon Short Line R.R.*, 617 F. Supp. at 216.

**[5]** In addition to explaining how private property rights could vest (and be divested) under § 912, *Vieux* explained how non-vested reversionary interests should be analyzed. These non-vested reversionary interests are the inchoate reversionary rights that private property owners have after abandonment of use and occupancy of the right of way by the railroad, but before Congress or a court has declared the right of way abandoned or forfeited. *Id.* at 1340. As to these interests, *Vieux* held that non-vested reversionary interests arose after physical abandonment of the use and occupancy of the right of way. *Id.* at 1340-41. *Vieux* also held that these non-vested reversionary interests could be extinguished if the former rights of way are "embraced in a public highway legally established within one year after the date of said . . . abandonment." *Id.* at 1341 (quoting in part § 912). In short, the creation of a public highway within one year of the physical abandonment would serve to extinguish the non-vested reversionary interests, which then could never become vested.

Under *Vieux*, then, there are two time periods in which the creation of a public highway would operate to extinguish reversionary rights. First, if a public highway were created within one year after physical abandonment (but prior to any declaration by Congress or court that would vest the rights), then the *non-vested* rights that arose at the time of abandonment would be extinguished. Second, after a declaration of forfeiture or abandonment by Congress or a court had vested the reversionary rights, the *vested* reversionary rights that arose after the declaration could be *divested* by the creation of a public highway within one year of the declaration.[8]

---

[8]At first blush, *Vieux*'s construction of § 912 as providing two periods in which rights could be extinguished may seem anomalous. However, it

## A

The first question in our case, then, is whether any non-vested reversionary interests arose by the railroad's cessation of use and occupancy of the Noxon right of way. The record supports the district court's conclusion that Northern Pacific physically abandoned the right of way in October, 1958.

**[6]** The question of when a railroad has ceased using and occupying a right of way for railroad purposes involves a factual inquiry. *Vieux*, 906 F.2d at 1340. The inquiry is guided by the "plain and apparent meaning of the [statutory] terms," as well as "common law principles of abandonment." *Id.* Common law principles of abandonment include a "present intent to abandon," and "physical acts evidencing clear intent to relinquish the property interest." *Id.* at 1341 (citing *Oregon Short Line R.R.*, 617 F. Supp. at 217). "Other circuits have characterized 'abandonment' to be 'an intention of the carrier to cease permanently or indefinitely all transportation service on the relevant line.' " *Id.* at 1340 (quoting *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 314, n.2 (1981)). Among the indicia relevant to the "use and occupancy" inquiry are whether railway services have been discontinued, whether the railroad has removed its tracks and other railroad structures, whether it uses the right of way for storage or other railroad purposes such as training exercises, whether maintenance of the line has been discontinued, and whether the railroad continues to pay property taxes on the right of

is consistent with the congressional purpose, as expressed in the legislative history of § 912 of providing a mechanism for resolving title disputes. *See Mauler*, 309 F.3d at 1001 ("[T]he legislative history of § 912 reveals that Congress enacted the law primarily to resolve title disputes with respect to abandoned and forfeited federal railroad lands of the type discussed in *Townsend*.") (citing *S. Rep. No. 67-388* (1922) and *H.R. Rep. No. 67-217* (1921)). Through its construction of § 912, the *Vieux* panel was able to resolve in a consistent manner how the highway exception applied to the differing claims of vested and non-vested reversionary interests.

way as "operating property." *Vieux*, 906 F.2d at 1340-41; *Oregon Short Line R.R.*, 617 F. Supp. at 217.

[7] Here, the evidence in the record strongly supports the district court's finding that Northern Pacific had ceased its use and occupancy of the railroad right of way in October, 1958. The 1955 Relocation Agreement established Northern Pacific's intent to "transfer, insofar as it may legally do so, all its rights and title in the present railroad property to be abandoned to [Washington Water] Power" following relocation of its line to the north side of the Clark Fork. The Agreement further provided that Washington Water Power was to "[r]emove the abandoned line of railroad" and could salvage the track that it replaced. In March and April 1957, Northern Pacific reiterated its understanding that "following relocation," its "main line on the south side of the river . . . between the two new river crossings, was to be abandoned and all service eliminated," and that it would "transfer all its rights and title in the present railroad property to be abandoned to" Washington Water Power and the abandoned line would "become the property of" Washington Water Power. These documents unmistakably evidence Northern Pacific's intent to abandon the right of way on the south side of the river.

[8] Northern Pacific thereafter followed through on its plans to abandon the right of way. In August 1957, the Montana Board of Railroad Commissioners ordered that Northern Pacific's stations on the south side of the river at Tuscor and Noxon be closed and abandoned. By late 1957, the relocation of Northern Pacific's rail line to the north side of the Clark Fork was completed and the railroad released its track and other personal property on the south side of the river to Washington Water Power. Northern Pacific and Washington Water Power later agreed that as of September 30, 1958, Washington Water Power would exclusively handle all traffic on the right of way. After questions arose regarding whether Northern Pacific could transfer title to Washington Water Power, it

executed a quitclaim to the right of way to Sanders County on October 1, 1958.[9]

[9] Avista argues that the fact that Northern Pacific did not obtain a court decree of abandonment, despite its familiarity with § 912, or petition the Interstate Commerce Commission ("I.C.C.") for permission to abandon the right of way, suggests that it did not intend to abandon the right of way. While petitioning the I.C.C. for abandonment proceedings is indicative of a railroad's intent to abandon, "[t]he I.C.C. does not determine abandonment." *Vieux*, 906 F.2d at 1339. Rather, action by the I.C.C. "is only a determination that under its Congressional mandate, cessation of service would not hinder I.C.C.'s purposes." *Id.* Here, interstate railroad transportation was not implicated; therefore, I.C.C. approval was not required.

Avista also makes several alternative arguments about the timing of the abandonment, suggesting that Northern Pacific continued its use of the rail line into the 1960's. Although there is some evidence of incidental use, the record as a whole supports the district court's conclusion that Northern Pacific physically abandoned the right of way by October, 1958.

[9]The quitclaim deed from Northern Pacific to Sanders County was insufficient to convey title. It only conveyed whatever interest Northern Pacific retained in the right of way. As we have noted, railroad companies granted land in the 1864 Act held title in the form of a non-conveyable "limited fee" that reverted "in the event that the company ceased to use or retain the land for which it was granted." *Townsend*, 190 U.S. at 271. Under the restrictions of the limited fee ownership of the right of way, a railroad did not have the power to transfer voluntarily its interest in the right of way. *Id.* While a railroad may convey its right of way for use as a public highway under some circumstances, the quitclaim deed did not meet the relevant conditions. *See* 43 U.S.C. § 913 (requiring the railroad to retain at least 100 feet of the right of way); 23 U.S.C. § 316 (requiring that the conveyance be to a state highway department). Thus, Northern Pacific's quitclaim to Sanders County was not effective to transfer fee ownership to the right of way.

B

**[10]** Given the conclusion that abandonment occurred in October 1958, the next question is whether a public highway was constructed within one year after that date, which would operate to extinguish any non-vested reversionary private property rights. The record supports the district court's conclusion that a public road was not established within the one year period. The County did not accept a purported conveyance of the property until February, 1961, and the record supports the district court's conclusion that public use of a road over the former railroad right of way did not commence until the early 1970's. Indeed, as late as 1975, the County questioned its authority over the former right of way.

**[11]** Given the undisputed evidence in the record, the district court properly concluded that a public highway was not established within the statutory one year period. Therefore, the non-vested private reversionary interests in the right of way were not extinguished by public highway use after physical abandonment.[10]

C

**[12]** Under *Vieux*, the next question presented would be whether Congress or a court of competent jurisdiction had declared the right of way abandoned, thereby vesting the private reversionary interests. Here, all parties concede that prior to the district court's declaration of abandonment, neither Congress nor a court of competent jurisdiction had acted. Therefore, the district court's order constituted a declaration of abandonment issued by a court of competent jurisdiction, as contemplated by § 912.

---

[10]This conclusion distinguishes this case from *Vieux,* where public use within a year of physical abandonment was conceded, thereby extinguishing any non-vested reversionary interests prior to any declaration of abandonment.

Normally, the § 912 analysis would end here. A final declaration of abandonment would be entered as a final judgment and the inchoate reversionary interests would be declared vested, subject to divestment if a public highway were established within a year after the formal declaration. However, in this case, the district court made its declaration of abandonment retroactive to the date of physical abandonment. Reasoning from that premise, the district court then determined that, because a public road had not been established within a year of physical abandonment, the private reversionary interests vested as of October, 1959. The district court erred in doing so.

**[13]** The district court reached its conclusion that a retroactive declaration was proper based on its analysis of *Vieux*, reasoning that if application of the highway exception could extinguish private interests retroactively, then the vesting of those interests could be declared retroactively. This reasoning ignores the distinction made in *Vieux* between inchoate and vested interests. As we have discussed, *Vieux* held that any inchoate interests created by physical abandonment could be extinguished by establishment of a public highway within one year of physical abandonment. However, *Vieux* also held that no inchoate reversionary interest could become vested until either Congress or a court of competent jurisdiction declared the right of way forfeited or abandoned. Thus, *Vieux* does not support the conclusion that a court could declare abandonment retroactively. Contrary to the district court's conclusion, the *Vieux* panel did not issue a retroactive declaration of abandonment, which would have the effect of vesting private property reversionary rights *nunc pro tunc*. Rather, *Vieux* held first that no vested rights were created because there had not been a congressional or court declaration of abandonment, and second that any inchoate rights created by physical abandonment had been extinguished by application of the public highway exception.

**[14]** A declaration of retroactive abandonment would be inconsistent with the plain language of § 912, which requires both physical abandonment and a formal declaration of abandonment for reversionary interests to vest. A retroactive declaration would also be incompatible with the structure of § 912, because it would deprive local and state governments of the opportunity to acquire the right of way pursuant to the § 912 highway exception.[11] For example, here, the operation of the district court's decision deprived Sanders County of the opportunity to acquire the right of way by first applying a declaration of abandonment retroactively, then declaring the County's rights under the highway exception extinguished by failure to act. We construe statutes to avoid such arbitrary forfeitures of property rights. *Hannifin v. United States*, 248 F.2d 173, 175 (9th Cir. 1957). In sum, the district court properly issued a declaration of abandonment, but erred applying the declaration retroactive to the date of cessation of use and occupancy of the right of way. The declaration of abandonment became effective upon entry of final judgment by the district court.

## III

**[15]** In the normal sequence of events, the entry of a final judgment declaring the right of way abandoned under § 912 would serve to commence the time period during which the

---

[11]The importance of affording the public the ability to construct a public road on the former right of way is reflected in the legislative history of § 912. *See* S. Rep. No. 336, 67th Cong., 2nd Sess. Vol. 1 (1922) ("Recognizing the public interest in the establishment of roads, your committee safeguarded such rights by suggesting the amendments above referred to protecting not only roads now established, but giving the public authorities one year's time after a decree of forfeiture or abandonment to establish a public highway upon any part of such right-of-way."); House Debate H.R. 244, 67th Cong., 1st Sess. Vol. 61 (August 1, 1921) ("Likewise [the bill] gives to the public authorities in charge of the establishment of highways the opportunity to establish a legal highway thereon within one year after the decree of forfeiture or abandonment.").

highway exception could be established by the creation of a public road.[12] However, in this case, the public road had already been established prior to the declaration of abandonment. Thus, although the Hamptons' inchoate reversionary interests became vested as of the entry of final judgment declaring the right of way abandoned, those interests were immediately divested by the existence of a previously established public road under § 912.

The remaining question is the scope of the interest the County would acquire under the statute. Under *Vieux*, the County could acquire the entire right of way through use as a public road constructed within a year of abandonment declaration. 906 F.2d at 1342. However, right to the entire right of way is not vested as of the declaration date. As the district court concluded, only the portion of the right of way dedicated to public road use ultimately transfers to the County. Under the plain language of § 912, the public highway exception does not apply to an entire abandoned right of way, but only to "*such part thereof* as may be embraced in a public highway . . . ." 43 U.S.C. § 912 (emphasis added). Section 1248's highway exception is similarly limited, granting title only "to the extent that any such right-of-way, or portion thereof, is embraced within a public highway . . . ." 16 U.S.C. § 1248.

---

[12]Although the issue was not raised by the parties, nor considered by the district court, there is a question about whether § 912 applies to declarations of abandonment issued after the effective date of the National Trails System Improvements Act of 1988. Pub. L. No. 100-470; 102 Stat. 2281. However, as we have noted, under that Act, railroad rights of way abandoned after October 4, 1988 revert to the United States, except to the extent that the right of way is embraced in a public highway within a year following abandonment. 16 U.S.C. § 1248(c). As both statutes contain the public highway exception, the question of which applies is not relevant to our analysis of the County's rights. The district court can address the other implications of the National Trails System Improvements Act of 1988 on remand.

**[16]** State law defines the establishment and scope of a public highway for the purposes of § 912 and § 1248. *Vieux*, 906 F.2d at 1341. Under Montana law, only the portion of the former right of way that the County has established as a road open to the public qualifies as a public highway. Mont. Code Ann. § 60-1-103 (defining public highways as "all streets, roads . . . and related structures . . . dedicated to public use"). Upon the declaration of abandonment, the portion of the former right of way that is now a public road transfers to Sanders County, and the County has one year to establish a highway on the remainder of the former right of way if it so chooses. Because the issues were not raised or briefed before us, we leave it to the district court on remand to determine whether the one-year period commencing upon its declaration of abandonment was tolled during the appeal, and whether § 912 or § 1248 applies to any portion of the abandoned right of way not embraced in a public highway at the end of this period.

## IV

In addition, there are a number of state law claims made by the parties as to scope of the right of the County in the right of way under state law and the propriety under state law of certain actions taken by the County. We need not, and do not, address any of these issues. Those questions are best addressed by the district court on remand.

In sum, we affirm the district court's finding that the railroad's use and occupancy of the right of way ceased as of October 1958 and that the County did not establish a public road within one year of that date. We therefore hold that the Hamptons' inchoate non-vested reversionary interests in the right of way were not extinguished by the subsequent establishment of a public road. We affirm the district court's declaration of abandonment, but reverse the district court's retroactive application of the abandonment declaration. We hold that the declaration of abandonment became final when judgment was entered by the district court. On that date, the

Hamptons' inchoate interests became vested, but were divested as to the portion of the right of way already embraced in a public highway. As to any additional portions of the right of way that the County might desire to use for that purpose, we leave it to the district court on remand to determine whether the one-year period to establish a public highway, commencing with its declaration of abandonment, was tolled during the appeal. We also leave it to the district court to determine the application of § 912 or § 1248 to any portion of the former right of way not embraced in a public highway within the one-year period. We need not, and do not, reach any other issue presented by this case.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED.**

Each side will bear their own costs.