# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 09-2876, 09-2879

SAMUEL C. JOHNSON 1988 TRUST, *et al.*,

*Plaintiffs-Appellants,*

*v.*

BAYFIELD COUNTY, WISCONSIN,

*Defendant-Appellee.*

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 06-cv-348-bbc—**Barbara B. Crabb**, *Judge.*

ARGUED APRIL 13, 2011—DECIDED JUNE 17, 2011

Before POSNER, WOOD, and TINDER, *Circuit Judges.*

POSNER, *Circuit Judge.* The plaintiffs are landowners in Bayfield County, a rural county at the northern tip of Wisconsin. They brought this suit to quiet title to their property, over which the County claims a right derived from federal law to build snowmobile trails; the plaintiffs contest the County's claim. The district court granted summary judgment in favor of the plaintiffs. We

reversed, 520 F.3d 822 (7th Cir. 2008), on grounds unrelated to the present appeal, which is by the plaintiffs from the district court's decision on remand, rendering judgment as a matter of law for the County.

The suit arises in the first instance under state law, and since there is not complete diversity of citizenship the case might seem to lie outside federal jurisdiction. But as we held in our previous opinion, 520 F.3d at 827-28, correctly though perhaps a bit cryptically, because the property was once owned by the federal government and the plaintiffs ultimately base their suit on the terms of the original federal grants, the suit may be said to arise under federal law as well. See, e.g., *Hopkins v. Walker,* 244 U.S. 486, 489-90 (1917). The County, moreover, could just as well have brought the quiet-title action as the plaintiffs, and in that event the claim would have arisen under federal law because, as we'll see, that's the basis of the County's claim to a right of way. That brings the case—because a suit to quiet title is functionally a form of declaratory-judgment action (see Samuel Bray, "Preventive Adjudication," 77 *U. Chi. L. Rev.* 1275, 1276 (2010)), the only relief sought being a declaration of rights—within the rule that "in declaratory judgment cases, the well-pleaded complaint rule dictates that jurisdiction is determined by whether federal question jurisdiction would exist over the presumed suit by the declaratory judgment defendant." *GNB Battery Technologies, Inc. v. Gould, Inc.,* 65 F.3d 615, 619 (7th Cir. 1995).

The case also satisfies the jurisdictional standard of *Grable & Sons Metal Products, Inc. v. Darue Engineering &*

*Mfg.*, 545 U.S. 308, 312-16 (2005), one of those cases in which the Supreme Court seems shy about taking a definite stand. See, e.g., *New Hampshire v. Maine*, 532 U.S. 742, 749-51 (2001), discussed in *Walton v. Bayer Corp.*, No. 10-3462, 2011 WL 1938428, at *6 (7th Cir. May 23, 2011). *Grable* tells us to ask: "does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities"? 545 U.S. at 314. The answer in this case is "yes."

With federal jurisdiction secure, we turn to the merits. The material facts are uncontested. In the early days of railroading, the federal government encouraged this immensely promising mode of transportation by a variety of means, including by imposing a checkerboard pattern on large areas of federal public domain, see, e.g., *Leo Sheep Co. v. United States*, 440 U.S. 668, 672-73 (1979), some of it in Wisconsin. Federal statutes enacted in 1856 and 1864 divided this public domain land in Wisconsin into identical square sections, designated by alternating odd and even numbers, and gave the odd-numbered sections to states to give to railroads in fee simple, while retaining the even-numbered sections for sale by the government. Act of June 3, 1856, ch. 43, 11 Stat. 20; Act of May 5, 1864, ch. 80, 13 Stat. 66.

Railroads needed to be able to run their tracks across even-numbered sections as well as across the odd-numbered ones that they owned, since each odd-numbered one was surrounded by even-numbered ones,

just as each square on a black-and-white checkerboard (unless the square is at a side or end of the board) is surrounded by squares of the other color. But the railroads didn't need all the land in either type of section for their tracks. They were expected to use part of the odd-numbered sections (which they owned) for their tracks and rent or sell the rest; the sale and rental proceeds would help not only to finance the construction or extension of their lines but also to pay for the purchase or condemnation of any rights of way that they needed in the even-numbered sections. Owners and renters of land proximate to the tracks, such as farmers and lumbermen, would become part of the railroad's customer base.

The plaintiffs own lots in Bayfield County in sections numbered 21 (odd) and 32 (even). A railroad used to cross these lots, and the County premises its asserted right to build a snowmobile trail where the railroad tracks used to be on the railroad's right of way and on what the County argues is a federal "reversionary interest" in the right of way, an interest it contends was given to the County by a federal statute enacted in 1922.

We begin our analysis with the lot in the even-numbered section. It had been bought by the plaintiffs' remote predecessor from the federal government in fee simple in a series of transactions between 1882 and 1884 (remember that it was the even-numbered lots that the government sold off rather than giving to states to give to railroads). The railroad obtained a right of way over the lot in the form of an easement (a right to use a piece of land for a specified purpose, rather than fee simple), by con-

demnation, and the nature of such a right may seem to nix the County's argument. For the railroad's successor abandoned the right of way; and when an easement is abandoned the owner of the fee simple is revested with full rights to the property. But the County argues that, no, a federal statute enacted in 1852, and thus before the checkerboard statutes were enacted, had granted a right of way in federal lands to railroads that were "now [chartered] or that may be chartered within ten years hereafter." Act of Aug. 4, 1852, ch. 80, 10 Stat. 28. The right of way reverted—the argument continues—to the federal government when its use by the railroad ended, and the reversionary interest passed to the County by virtue of the 1922 statute.

The 10-year deadline in the 1852 Act for chartering a railroad that would obtain a federal statutory right of way was extended to fifteen years by the Act of July 15, 1862, ch. 179, 12 Stat. 577. A railroad called the St. Croix and Lake Superior Railroad was chartered in 1854, well within that period, to build a rail line that would have crossed the plaintiffs' lots. But it failed to build anything. In 1871, another railroad, the North Wisconsin Railroad, was chartered to build a rail line on the same route and eventually it (actually a successor, but we can suppress that detail) did so. But because it had been chartered after the 15-year deadline for obtaining a federal right of way expired in 1867, it acquired no rights under the 1852 Act. And as there was no corporate relationship between the St. Croix and North Wisconsin railroads—no asset or stock acquisition that

might have made the latter a successor to the former (and no mention of the 1852 Act in the North Wisconsin's charter)—the chartering of the St. Croix could not be deemed the chartering of the North Wisconsin. Cf. *Chicago Great Western Ry. v. Minnesota*, 216 U.S. 234, 239-40 (1910); *Northern Pac. Ry. v. Minnesota ex rel. Duluth*, 208 U.S. 583, 587 (1908); *Keokuk & Western R.R. v. Missouri*, 152 U.S. 301, 304-12 (1894). The North Wisconsin implicitly acknowledged its failure to comply with a condition precedent to obtaining a right of way under the 1852 Act by using condemnation to obtain the rights of way that it needed for its railroad line.

The County argues that only the United States has standing to claim that conditions in a federal land grant have not been met. But the cases on which it relies, such as *Schulenberg v. Harriman*, 88 U.S. (21 Wall.) 44 (1874), and *Van Wyck v. Knevals*, 106 U.S. 360 (1882), concern conditions subsequent—conditions specified in the grant that would have entitled the government to rescind it; if the government isn't interested in doing that, no one can butt in. But the question is whether the North Wisconsin Railroad satisfied a condition precedent (namely, becoming chartered by 1867) to obtaining any rights under the 1852 Act. If it didn't—and it didn't—it never acquired a right of way that might have descended to Bayfield County.

In 1875 the last relevant event before the plaintiffs' predecessor perfected his acquisition of the lot in 1884 occurred—Congress authorized the Secretary of the Interior to create railroad rights of way in federal lands.

Act of March 3, 1875, ch. 152, 18 Stat. 482. The lot was still federal land when the Act was passed, but there is no indication that the North Wisconsin Railroad complied with the statutory requirements for obtaining a right of way; instead, as we said, it used condemnation. A 1916 report by the Interstate Commerce Commission on lands owned or used by the North Wisconsin described the right of way that crossed the lot as having been obtained by condemnation; lands instead obtained under the 1875 Act were explicitly so designated in the report.

Furthermore, the rights of way created under the authority of that Act were easements; the government retained fee simple. So although "all such lands over which such right of way shall pass shall be disposed of subject to such right of way," Act of March 3, 1875, *supra*, § 4, 43 U.S.C. § 942-5, when in the 1880s the government sold the plaintiffs' predecessor the lot, the railroad, even if it had had rights under the 1875 Act (we said it didn't), had merely an easement. A variety of official documents confirm this. See, e.g., 12 Public Lands Dec. 423, 428 (Jan. 13, 1888); 14 Public Lands Dec. 338, 342 (Mar. 21, 1892); 27 Public Lands Dec. 663, 664 (Nov. 4, 1898); Act of June 26, 1906, ch. 3550, 34 Stat. 482, codified at 43 U.S.C. § 940. And as we noted earlier, the termination of an easement restores to the owner of the fee simple full rights over the part of his land formerly occupied by the right of way created by the easement. *Restatement (Third) of Property: Servitudes* § 7.4 comments a, c, f (2000).

*Marshall v. Chicago & Northwestern Transportation Co.*, 31 F.3d 1028, 1031 (10th Cir. 1994), holds, it is true, that the 1875 Act created a reversionary interest in the federal government, in which event a right of way abandoned by a railroad would revert to the federal government and so be transferable to the County. But *Hash v. United States*, 403 F.3d 1308, 1316-17 (Fed. Cir. 2005), and *Beres v. United States*, 64 Fed. Cl. 403, 425-28 (Fed. Ct. Cl. 2005), are to the contrary, and, though criticized in Darwin P. Roberts, "The Legal History of Federally Granted Railroad Rights-of-Way and the Myth of Congress's '1871 Shift,'" 82 *U. Colo. L. Rev.* 85, 150-64 (2011), make better sense than *Marshall*, as well as being supported by the characterization in *Great Northern Ry. v. United States*, 315 U.S. 262, 271-79 (1942), of the rights of way created under the 1875 Act as "easements." The Act does not hint at a reversionary interest, and who searching the chain of title of a lot never owned by a railroad would suspect a lurking governmental right so unsettling to the security of private property rights? If *Marshall* was correctly decided, no one in 2011 who owned land subject to the 1875 Act—that is, land over which there had once been a federal railroad right of way—has a right to prevent the federal government from recapturing the right of way—of course without compensation—and giving it away or selling it. (The County argues that the government gave it the right of way through the plaintiffs' lot in the even-numbered section in the 1922 statute.) Countless tracts of private land would be encumbered with a federal easement even though no conferral of such an interest appeared in a statute or a chain of title.

Let's turn to the lot in the odd-numbered section. The federal government had conveyed it in fee simple to Wisconsin, which in turn had conveyed it to the North Wisconsin Railroad in 1874. More than a century later—in 1980—the railroad's successor, the Chicago and North Western Transportation Company, had sold the lot to the plaintiffs, also in fee simple. A railroad that obtained land in fee simple had no need for a right of way; you don't need a right of way in order to be allowed to lay tracks on land that you own. But Bayfield County argues that the grant of railroad rights of way in the 1852 Act had taken the right of way to build across the plaintiffs' lot out of what otherwise would have been an unencumbered fee simple, with the result that when the land was later transferred to the State of Wisconsin (ostensibly in fee simple) and then to the railroad (also in fee simple), the right of way remained and was subject to a federal reversionary interest that the County claims to have acquired more than a century later.

This argument fails at the threshold because the North Wisconsin Railroad, as we explained earlier, acquired nothing under the 1852 Act. But the County has a back-up argument, which it presses very hard, based on our decision in *Mauler v. Bayfield County*, 309 F.3d 997, 1000-02 (7th Cir. 2002), a case involving the same North Wisconsin rail line as this case, the Maulers being other owners of land through which the line passes. *Mauler* says that "the original grants of land in this case were grants to the Railroad in fee simple that included an implied right of reverter to the United States under

the rationale first espoused in [*Northern Pacific Ry. v. Townsend*, 190 U.S. 267 (1903)]." *Id*. at 1001.

But there is a crucial difference between *Townsend* on the one hand and *Mauler* and the present case on the other. The issue in *Townsend* was whether the owner of land adjacent to a railroad line could obtain by adverse possession under state law part of a right of way that had been expressly granted by the federal government to the railroad under authority of still another nineteenth-century statute, the Act of July 2, 1864, ch. 217, 13 Stat. 365, which both chartered the Northern Pacific and granted the new railroad extensive interests in federal lands, including the right of way in question. The Court held that the landowner could not obtain a chunk of the right of way by adverse possession because the government had expressly created a railroad right of way, and the Court in *Townsend* reasoned that the government would not have wanted the land used for any other purpose; so no other use was permissible.

The statutes under which the federal lands in this case passed into private hands did not create railroad rights of way; in the case of the odd-numbered sections they directed the conveyance of the land outright to the railroad and in the case of the even-numbered ones they authorized sale to buyers not limited to railroads. The railroad could run its line through the odd-numbered sections, which it owned, and continue its line through the even-numbered sections by condemning a right of way. There was no federal grant of a rail-

road right of way on which to base an inference of a federal reversion.

*Mauler* recognized no difference "between a land grant for a 'right of way . . . for the construction of a railroad' (the *Townsend* grant) and a land grant 'for the purpose of aiding the construction of a railroad' (the grant in [*Mauler*])." 309 F.3d at 1001. Both the 1864 grant in *Townsend* and the grants under the 1856 Act and the (different) 1864 Act in *Mauler* and the present case were indeed intended to promote the railroad industry. But they went about it in different ways. The Act involved in *Townsend* created rights of way; the Acts involved in *Mauler* and the present case gave federal land to railroads, most of which they would sell, and authorized the sale of adjacent federal lands to buyers in general to encourage economic development along the railroads' routes and thus enlarge the railroads' customer base. These are different promotional techniques, and the second, which is the one pertinent to this case, does not create rights of way—as is further apparent from the fact that nineteenth-century federal statutes created railroad rights of way of differing widths. See, e.g., Act of Aug. 4, 1852, *supra*, § 1 (100 feet); Act of March 3, 1875, *supra*, § 1 (200 feet); Act of July 2, 1864, *supra*, § 2 (400 feet). If grants under the 1856 and 1864 Acts create an implied federal reversionary interest in these rights of way, how wide are they? The Acts don't say; they don't mention rights of way. How would a court determine their width?

*Mauler* mentions only in a footnote, and does not cite, the 1856 statute and the relevant 1864 statute, which are

the sources of the plaintiffs' property rights. It does not mention either the 1852 or 1875 statutes that, like the 1864 statute involved in *Townsend*, created railroad rights of way—and since *Mauler* was decided, cases that we cited earlier (*Hash* and *Beres*) have persuasively rejected an implied federal reversionary right under the 1875 statute. We did not have the benefit of those cases when we decided *Mauler*, and we are not bound by rulings on issues that the briefs skirted and the opinion barely addressed.

*Mauler* is further distinguishable from the present case because in *Mauler* the railroad had retained in fee simple the strip of land that constituted its right of way, and it conveyed the fee simple to Bayfield County. The County was therefore entitled, quite apart from any federal rights in the land, to build a recreational trail on it. There was no need to posit an implied federal reversionary interest.

On the foundation that we have been busy dismantling—that there was once upon a time a grant by the federal government of a railroad right of way in the plaintiffs' lots—the County piles still another federal statute, 43 U.S.C. § 912. Enacted in 1922, it provides that "whenever public lands of the United States have been . . . granted to any railroad company for use as a right of way for its railroad . . . , and use and occupancy of said lands for such purposes has ceased or shall hereafter cease, whether by forfeiture or by abandonment by said railroad company declared or decreed by a court of competent jurisdiction or by Act of Congress, then

and thereupon all right, title, interest, and estate of the United States in said lands shall [be vested in the owner of the land traversed by the right of way], *except such part thereof as may be embraced in a public highway legally established within one year after the date of said decree or forfeiture or abandonment*" (emphasis added).

A "public highway legally established" is conceded by the plaintiffs (albeit rather in the teeth of the applicable statutory language, see Wis. Stat. §§ 340.01(22), (74), 350.01(17); but see *Mauler v. Bayfield County*, 204 F. Supp. 2d 1168, 1177-79 (W.D. Wis. 2001), aff'd, 309 F.3d 997 (7th Cir. 2002)) to include snowmobile trails; and Bayfield County argues that the statutory language that we just quoted authorized it to build such trails on the plaintiffs' lots. The premise (acknowledged by the County), given the first sentence of section 912 quoted above, is that the North Wisconsin Railroad was granted a right of way in the plaintiffs' lots by the federal government because those lots had once been federal lands. We have rejected that premise; the 1856 and 1864 statutes, which provided for the relinquishment of federal ownership, created or retained no rights of way. Furthermore, although the railroad line traversing the lots was abandoned in 1980, it was not until the mid-2000s that the County declared its intention to build snowmobile trails on them. So the County missed the one-year statutory deadline for "embracing" a right of way in a public highway.

The County ripostes that the abandonment was ineffectual because it was not "declared or decreed by a

court of competent jurisdiction or by Act of Congress." That is literally true, but read literally the statute is non-sensical.

The process of rail abandonment involves obtaining the permission of the Interstate Commerce Commission (or, nowadays, its successor, the Surface Transportation Board) followed by the pulling up of the tracks. The Chicago and North Western Transportation Company (the North Wisconsin Railroad's successor) obtained the ICC's permission to abandon the Bayfield line, and having done so pulled up the tracks in 1980 and even quitclaimed the right of way to the plaintiffs, though a quitclaim deed would not affect title to a right of way owned by someone other than the quitclaimer.

Owners of land traversed by the now abandoned rail line could out of an abundance of caution have sued to quiet title by obtaining a judicial ruling that the line had indeed been abandoned. But this formality has not been observed in rail abandonments. Many thousands of miles of railroad were abandoned between 1922, when section 912 was enacted, and 1988, when the National Trails System Improvement Act, 16 U.S.C. § 1248(c), ordained that abandoned federal rights of way no longer go to private owners but instead revert to the federal government unless they come within the public-highway provision of 42 U.S.C. § 912. Yet the parties (and we) have been unable to find more than a handful of judicial rulings declaring a rail line abandoned under section 912. The regulator's (the ICC's or STB's) permission to abandon, coupled with the removal

of the tracks (abandonment in fact), was sensibly accepted as adequate proof of abandonment in *Keife v. Logan*, 75 P.3d 357, 358 (Nev. 2003) (per curiam). A formal declaration was necessary only if contrary proof was presented or surprise claimed.

It is true that the Ninth Circuit, in *Avista Corp. v. Wolfe*, 549 F.3d 1239, 1250-51 (9th Cir. 2008), ruled that there can be no "retroactive" declarations of abandonment; and if that is right then anyone claiming abandoned property had to have gotten a judicial declaration at the outset that the right of way had been abandoned, which as we said was not the practice. But *Avista* is distinguishable from our case because the ICC had not granted permission to abandon the right of way in that case, and that was a significant omission because the ICC's grant of permission to abandon a railroad line signals imminent abandonment to anyone wanting to oppose the abandonment; no one can credibly claim surprise if the railroad complied with the ICC's requirements for providing notice to all possibly affected persons. See 49 C.F.R. § 1152.20(a). *Avista* is also inconsistent with *Keife v. Logan*.

But most important, it is unpersuasive. The court thought the statute must be construed to require that the declaration precede the abandonment because to allow "retroactive" declarations would result in "arbitrary forfeitures of property rights." 549 F.3d at 1250. There is no retroactivity or arbitrariness. Suppose *A* has for many years owned property on which *B* now encroaches, claiming to own a piece of it. The encroach-

ment is "open and notorious," as the cases say. Nevertheless *A* does nothing. After the expiration of the period of prescription, say seven years, *B* brings suit to quiet title, arguing that by operation of the doctrine of adverse possession it has acquired the part of *A*'s property on which it encroached, and prevails. *A* loses the property, but the ruling merely confirms that he had already lost it, as a result of *B*'s actions (and *A*'s inaction) in the past. If that's a retroactive dispossession, it's entirely proper. But why haggle over words? For who denies the legitimacy of acquisition of title by adverse possession (unless there is a conflict between state and federal rights, as held in *Townsend*)? And what is this case about but shifting title to abandoned property by a parallel method?

The plaintiffs, being the owners of the land traversed by the railroad's right of way, acquired the right of way (if there was one—we said earlier there was not), by operation of section 912, a year and a day after the railroad, having obtained the ICC's permission to abandon its line, pulled up the tracks, completing the abandonment. The County was aware of the abandonment and indeed considered buying the right of way from the railroad at that time. Instead it waited a quarter of a century and then claimed a right to obtain the right of way for nothing. That claim has no basis in section 912. The County can still build snowmobile trails on the plaintiffs' lots if it wants, but it hasn't yet acquired the right to do so, because it failed to invoke the right within the statutory deadline of one year. It will have to buy the right from the plaintiffs or take it by exercise of its condemnation powers.

We are supported in thinking a prospective judicial declaration of abandonment unnecessary not by a literal reading of section 912 (which isn't possible, because "decree or forfeiture or abandonment" is a garble) but by reflection on how onerous the process for obtaining regulatory authorization to abandon a rail line is, see 49 C.F.R. §§ 1152.1 *et seq.*, and how even if authorization is obtained the railroad still must run the gauntlet of judicial review in order to be allowed to abandon a line. 28 U.S.C. §§ 2321, 2342(5); *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 321-23 (1981). A railroad is hardly likely to incur the expense of abandonment proceedings if it doesn't intend to abandon the rail line if given permission to do so—and promptly too, as authority to abandon expires after a year. 49 C.F.R. § 1152.29(e)(2). It is true that many years after the abandonment of the Bayfield line Congress authorized a more abbreviated procedure for abandonment than was followed by the railroad in this case. 49 U.S.C. § 10502; 49 C.F.R. §§ 1121.1 *et seq.* But since the line was abandoned under the old procedure, the new procedure is inapplicable and so we needn't consider whether it provides enough notice and other process to make a judicial declaration necessary for an abandonment under the new procedure to be effective.

With permission to abandon granted upon adequate notice to potentially interested persons by the agency authorized to determine whether to permit abandonment and with the permission sure to be acted on by removal of the tracks, a requirement of a judicial proceeding issuing in a decree of abandonment would

be a waste of time and money. Would a judge have to demand testimony that the railroad really did remove the tracks? And that it didn't remove them just to clean and polish them, meaning to re-lay them later? The proceeding would be empty.

When the rare case arises in which there is a dispute over whether a right of way has been abandoned, a claimant who doubts that it has been can sue; but he cannot just claim that the absence of a formal prospective declaration in a judicial opinion or Act of Congress means that the right of way never was abandoned. And, to repeat, we reject the premise that either lot at issue in this case was ever encumbered by a federally granted railroad right of way that might later have reverted to the federal government and passed from it to Bayfield County.

So the County has no right to build a snowmobile trail across the plaintiffs' lots without obtaining that right by purchase or condemnation, and the judgment in the County's favor is therefore reversed with instructions to enter judgment for the plaintiffs.

REVERSED.